[Cite as *Malek v. eResearch Technology, Inc.*, 2022-Ohio-3330.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CHAD MALEK,                                       :

    Plaintiff-Appellant,            :

    v.                              :                No. 111232

ERESEARCH TECHNOLOGY, INC.,       :
ET AL.,

    Defendants-Appellees.           :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 22, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-20-933338

---

### *Appearances:*

Kushner & Hamed Co., L.P.A., Philip S. Kushner, Michael R. Hamed, and Brandon Mordue, *for appellant.*

Gallagher Sharp LLP, Lori E. Brown, and Maia E. Jerin, *for appellees.*

KATHLEEN ANN KEOUGH, P.J.:

{¶ 1} Plaintiff-appellant, Chad Malek, appeals from the trial court's judgments granting (1) defendants-appellees eResearch Technology, Inc. ("ERT"), and James Corrigan's motion for summary judgment on Malek's fraud claim, (2)

defendants-appellees ERT and Steve Nuckols's motion for summary judgment on Malek's claim for negligent misrepresentation, and (3) defendant-appellee Timothy Kulbago's Civ.R. 12(C) motion for judgment on the pleadings regarding Malek's fraud claim.[1]  For the reasons that follow, we affirm.

## I.    Factual Background

{¶ 2}    The record in this case reveals the following facts.  ERT is a global data and technology company that offers products and services to minimize risks in clinical trials.  Malek was the global vice president of imaging sales at ERT from February 2017 until May 28, 2019, when he voluntarily resigned from his employment.  Corrigan, Nuckols, and Kulbago were part of ERT's management team.  Nuckols and Kulbago reported to Corrigan, who was ERT's former chief executive officer; Nuckols was ERT's chief commercial officer and Malek's direct supervisor; and Kulbago was ERT's vice president of imaging.

{¶ 3}    In 2019, ERT was owned primarily by two investors, Nordic Capital and Novo Holdings.  Nordic and Novo held seats on ERT's Board, along with an independent board member and Corrigan.  As private equity investors, Nordic and Novo's goals included obtaining a return on their investment, whether through a sale of ERT or co-investment, and they regularly explored potential sale or investment opportunities.

---

[1] Malek does not challenge the trial court's grant of summary judgment to Nuckols on Malek's fraud clam against him nor the granting of Corrigan's and Kulbago's Civ.R. 12(C) motions for judgment on the pleadings regarding Malek's negligent misrepresentation claim against them.  He thus has waived any argument on appeal regarding the trial court's rulings on these claims.

**{¶ 4}** Malek was not an ERT stockholder but was granted options pursuant to the Goldcup Holdings, Inc. 2016 Stock Option Plan ("SOP") to purchase ERT stock under certain scenarios.[2] Pursuant to the SOP terms, option holders could potentially receive a payout if there was a "change in control" at ERT, which the SOP defined as "the sale of the company * * * to an independent third party" where "such party or parties acquires * * * more than 50% of the voting power of all outstanding voting Equity Securities of the Company * * *."

**{¶ 5}** ERT's investor group, Nordic, responded to frequent potential investor inquiries during the first quarter of every year. In early 2019, after Nordic attended an industry conference, it received inquiries from several potential investors. Nordic and Novo decided to explore these opportunities and engaged an outside consulting firm to help them "evaluate potential strategic alternatives for ERT." Nordic and Novo had preliminary discussions with several entities in early 2019, naming these initial discussions "Project Tenerife." These initial discussions were handled by Nordic and Novo without ERT's involvement. In February 2019, Nordic asked Corrigan to prepare a presentation for a number of potential investors, including investment company Astorg, who were making inquiries about ERT.

**{¶ 6}** On March 4, 2019, Bloomberg News published an article headlined "Nordic Capital Considering Sale of ERT." The Bloomberg article, in its entirety, stated:

---

[2] Malek was granted 743,113 shares at an exercise price of $1.00 per share.

Buyout firm Nordic Capital is considering a sale of health-care data collection company ERT Operating Co., people with knowledge of the matter said.

Nordic has held talks with potential advisers about strategic options for the Philadelphia-based ERT, said the people, who asked not to be identified because they weren't authorized to speak publicly. ERT could fetch about $2.5 billion in a sale, one of the people said. Nordic hasn't made a final decision on whether to pursue a sale and could still elect to keep the business, they said.

A representative for ERT referred request for comment to Nordic. A spokeswoman for Nordic, with offices including Stockholm, declined to comment.

Nordic agree to buy ERT from peer Genstar Capital in March 2016 in a deal that valued the company at about $1.8 billion. The company, which provides patient data collection solutions for use in the development of clinical pharmaceutical products, has grown via acquisitions including Biomedical Systems Corp. and iCardiac Technologies Inc. in 2017, according to its website.

Nordic, which is led by Managing Partner Kristoffer Melinder, has invested about 13 billion euros ($14.7 billion) since being founded in 1989. The company also owns shares in air-treatment firm Munters Group AB and consumer loans and deposits company Nordax Group AB, according to its website.

{¶ 7} Upon learning of the article, one ERT board member emailed Corrigan and Raj Shah, a partner at Nordic and a board member, that it was "not good to have this story out there. So much for keeping these initial chats quiet." Shah responded, "[A]gree no[t] great having rumors but not sure it makes much of an impact." The board member responded, "Agree we don't need to focus much on it—but hopefully Jim doesn't create too much internal distraction for you to manage and doesn't impact negatively our recruiting efforts." Corrigan responded that "it

will be a distraction for a few days" and that he would let them know if the article impacted recruiting.

{¶ 8} The Bloomberg article contained a number of inaccuracies, including misidentifying ERT's name and misrepresenting it as a data-collection company. On March 5, 2019, ERT's Chief Strategy Officer sent an email to ERT employees confirming the article's inaccuracies. That same day, Malek attended a management team meeting during which Corrigan confirmed to the group that the Bloomberg article was not factual and that "a sale was not on the horizon."

{¶ 9} On March 7, 2019, Corrigan met with representatives from Astorg and Goldman Sachs. In light of the preliminary nature of the meeting and because he believed the companies were "window shopping," Corrigan gave a marketing pitch rather than an in-depth presentation. No other executive team members were advised of or attended the meeting due to the preliminary and confidential nature of the meeting. Corrigan admitted that because the talks were so preliminary, he had the Astorg people pose as Nordic personnel who were in town for a visit because if employees saw him walking around with people they did not recognize, "it might fuel up rumors," especially because the Bloomberg article had just been released.

{¶ 10} After the meeting, Corrigan reported to ERT's board that Astorg "seemed very interested in the space and company and our potential." Although Goldman Sachs was initially interested in ERT, it lost interest after another meeting in March 2019. Corrigan continued meeting with other potential investors and did

not meet with the Astorg representatives again until July 25, 2019, when Astorg became more serious about investing in ERT.

{¶ 11} In January 2019, Malek began exploring employment opportunities outside ERT. On April 2, 2019, ERT put Malek on a performance improvement plan. Malek felt that his job was in jeopardy because he believed that employees who are put on improvement plans generally leave their employment. Fearful of his future at ERT, in May 2019, Malek accepted a job with his current employer, BenchSci. Malek resigned from ERT on May 29, 2019, and his last day of work there was June 28, 2019. Upon resignation, pursuant to the SOP, Malek had 60 days, or until August 28, 2019, to exercise his stock options.

{¶ 12} In Malek's exit interview, both Corrigan and Nuckols asked him to stay on at ERT, and Kulbago told Malek that if he did not like his new job, he could come back to ERT. But Malek was determined to leave, explaining to Corrigan and Kulbago that his "decision to leave ERT [was] based on the fact that I know you lost faith in my ability to manage the commercial imaging team."

{¶ 13} In early June 2019, Nordic met with Astorg. Nordic reported to Corrigan that although the discussions were positive, the parties had not agreed on any specific next steps and "the ball was definitely in [Astorg's] court." Due to the preliminary nature of the discussions, Corrigan advised ERT's board that although certain members of the executive management team would make presentations to the board at its upcoming meeting regarding other subjects, they would not be

present nor participate in any discussions regarding Project Tenerife during the meeting.

**{¶ 14}** In early July 2019, Astorg became more serious about its interest in ERT and the discussions were given a new name: "Project Vinland." It was still unclear, however, whether ERT would ultimately strike a deal with Astorg or whether such an event would be considered a "change of control" that would affect employees' stock options.

**{¶ 15}** On July 24, 2019, Corrigan met with Astorg for a second meeting where he gave an in-depth presentation on a confidential basis. In late July, as Nordic and Astorg began the due diligence process, Nordic gave Corrigan permission to engage ERT's controller, general counsel, and vice president of financial planning in Project Vinland. However, because Astorg's deal with ERT was still uncertain, details were kept confidential from the rest of the executive management team.

**{¶ 16}** Finally, on September 8, 2019, because Astorg had become a serious potential investor, Corrigan disclosed to the entire executive management team, including Nuckols and Kulbago, that Nordic and Novo were considering a potential transaction and instructed them to attend a meeting in Boston on September 9, 2019, where further details would be disclosed.

**{¶ 17}** On October 21, 2019, ERT announced an investment by Astorg, who entered as a partner with the existing owners through a purchase of 41 per cent of ERT's shares. On October 28, 2019, in a text conversation with Nuckols, Malek

stated that he was going to exercise his stock options. When Nuckols advised him that he had missed the window to exercise, Malek responded that he had six months after leaving ERT to exercise his options. On October 29, 2019, Malek contacted his financial planner and asked him to procure a lender who would loan him the $500,000 plus that he believed he needed to exercise his options. Malek was subsequently informed by ERT that he had missed the window to exercise his options.

{¶ 18} On February 4, 2020, eight months after Malek voluntarily left ERT, the Astorg transaction closed. Because Astorg did not purchase ERT, and its investment was not at 50 per cent, the transaction did not meet the definition of "change of control" in the SOP so as to implicate a potential payout. However, a decision to liquidate ERT management's stock holdings was made in late fall 2019, well after Malek's stock options had expired and six months after the Bloomberg article was released.

## II. Procedural Background

{¶ 19} In June 2020, Malek filed suit against ERT, Corrigan, Nuckols, and Kulbago, asserting claims for fraud and negligent misrepresentation arising out of his decision to resign from ERT without exercising his stock options. After the pleadings were closed, the trial court granted Kulbago's Civ.R. 12(C) motion for judgment on the pleadings regarding both claims. ERT, Corrigan, and Nuckols subsequently filed a motion for partial judgment on the pleadings regarding the

negligent misrepresentation claim, which the trial court granted as to Corrigan but denied as to Nuckols and ERT.

{¶ 20} Both parties then filed cross-motions for summary judgment. Malek moved for summary judgment on his fraud claims against Corrigan and ERT and his negligent misrepresentation claim against Nuckols and ERT. ERT, Corrigan, and Nuckols (collectively, "appellees") moved for summary judgment on all remaining claims. The trial court denied Malek's motion and granted appellees' motion. This appeal followed.

## III. Law and Analysis

### A. Summary Judgment Rulings

{¶ 21} In his first assignment of error, Malek contends that the trial court erred in granting appellees' motion for summary judgment on his fraud claim against Corrigan and ERT and his negligent misrepresentation claim against Nuckols and ERT.

#### a. Standard of Review

{¶ 22} We review a trial court's decision on a motion for summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can only reach a conclusion that is adverse to the nonmoving party. *Zivich v. Mentor Soccer Club*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 210 (1998).

{¶ 23} The party moving for summary judgment bears the burden of demonstrating that no material issues of fact exist for trial. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). The moving party has the initial responsibility of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims. *Id.* After the moving party has satisfied this initial burden, the nonmoving party has a reciprocal duty to set forth specific facts by the means listed in Civ.R. 56(C) showing that there is a genuine issue of material fact. *Id.*

### a. Malek's Fraud Claim Against Corrigan

{¶ 24} The elements of fraud are (1) a representation of fact (or where there is a duty to disclose, concealment of a fact); (2) that is material to the transaction at issue; (3) made falsely, with knowledge of its falsity or with utter disregard and recklessness as to whether it is true or false; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the misrepresentation (or concealment); and (6) resulting injury proximately caused by the reliance. *Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 169, 462 N.E.2d 407 (1984). All of these elements must be present to find actionable fraud. *Westfield Ins. Co. v. HULS Am., Inc.*, 128 Ohio App.3d 270, 280, 714 N.E.2d 934 (10th Dist.1998). The absence of even one of these elements precludes recovery. *Id.*

{¶ 25} Malek's fraud claim against Corrigan is based on his contention that Corrigan fraudulently "denied ERT was pursuing a transaction" when he said in an

ERT team meeting on March 5, 2019, that the Bloomberg article was untrue and unfounded. Malek also asserted in his motion for summary judgment and his brief in opposition to appellees' motion for summary judgment that after the meeting, he asked Corrigan "too many times to count" whether there was any event on the horizon that could make his options valuable and Corrigan consistently told him "there was nothing that [he] saw that was going to * * * change the investment or the ownership of the company." He contends that if Corrigan had not misled him, he would have stayed at ERT and been paid for his stock options.

{¶ 26} Initially, we find that Malek cannot assert a fraud claim for Corrigan's alleged statements after the March 5, 2019 meeting that there was nothing on the horizon with respect to any upcoming event relating to Malek's stock options because these statements were not pled with particularity in the complaint, as required by Civ.R. 9(B). Under Civ.R. 9(B), the pleading must contain allegations of fact that tend to show each element of a cause of action for fraud. *Fast Tract Title Servs. v. Barry*, 8th Dist. Cuyahoga No. 110939, 2022-Ohio-1943, ¶ 12. "This means that a defendant must state 'the time, place, and content of the false representation, the fact misrepresented, and the nature of what was obtained or given as a consequence of the fraud.'" *Cord v. Victory Solutions, L.L.C.*, 8th Dist. Cuyahoga No. 106006, 2018-Ohio-590, ¶ 14, quoting *Carter Jones Lumber Co. v. Denune*, 132 Ohio App.3d 430, 433, 725 N.E.2d 330 (10th Dist.1999). Malek's complaint makes no allegation at all regarding Corrigan's alleged additional statements; the complaint's single allegation of fraud against Corrigan is that during a management

meeting the week of March 4, 2019, Corrigan told Malek and several other employees that the Bloomberg article was "false" and "likely had been released by a competitor to cause disruption." Thus, Malek's fraud claim against Corrigan is limited to this single instance of alleged fraud. Upon review, we find that the trial court properly dismissed this claim against Corrigan and by extension, ERT,[3] because Malek did not produce evidence in response to appellees' summary judgment motion regarding each element of his claim.

### a. No Material Misrepresentation

{¶ 27} First, Malek has produced no evidence that Corrigan made a material misrepresentation of fact on March 5, 2019, when he stated that the Bloomberg article was inaccurate or false. The Bloomberg article announced "Nordic Capital Considering Sale of ERT." But there is no evidence that Nordic had advised Corrigan that it was looking to sell ERT at that time. Rather, the evidence is clear that when Corrigan made the statement, he understood that Nordic was looking for a co-investor and that ERT was not for sale. In fact, ERT was never sold. As Corrigan testified in his deposition, "a co-investment occurred and a recap occurred, but not a sale."

{¶ 28} In addition to an inaccurate headline, the article itself contained several significant inaccuracies. It misidentified ERT's line of work, because it is not

---

[3] A party injured by an employee acting within the scope of his employment may pursue damages against the employer under the doctrine of respondeat superior, in addition to pursuing damages against the employee. *Osborne v. Lyles*, 63 Ohio St.3d 326, 329, 587 N.E.2d 825 (1992); *Schisler v. Columbus Med. Equip.*, 10th Dist. Franklin No. 15AP-551, 2016-Ohio-3302, ¶ 31.

a "healthcare data collection company." The article also falsely stated a sale price of $2.5 billion, which both Corrigan and Nuckols testified was inconceivable given that Nordic had just purchased ERT in 2016 for $1.8 billion and a sales price of $2.5 billion would not be a sufficient return for ERT's investors.

{¶ 29} Furthermore, the status of the discussions with the potential investors in March 2019 was so preliminary as to render any speculation regarding a potential purchase by Astorg wholly unsubstantiated. ERT's investor group, Nordic, responded to potential investor inquiries at the beginning of every year. When the Bloomberg article was published, discussions with a number of investors were in very preliminary stages. Corrigan could not disclose the possibility of a sale before Nordic had begun negotiating in earnest with Astorg or any other investor. Furthermore, in March 2019, Corrigan believed that the investors who had expressed an interest in ERT were merely "window shopping" and not seriously interested in ERT. In fact, no serious investment discussions were happening at that time and no sale was on the horizon. Thus, there is no evidence Corrigan misrepresented on March 5, 2019, that ERT was not considering a sale for $2.5 billion because no such sale was being considered or negotiated at that time.

{¶ 30} Malek contends that Corrigan lied when he said the article was not true, however, because the article accurately reported that ERT was considering a multibillion-dollar transaction. As support, he points to the phrase in the article stating that "Nordic has held talks with potential advisors about *strategic options* for Philadelphia-based ERT," and the fact that a month before the article was

released, ERT had hired consulting firm KPMG to advise it on "potential *strategic alternatives*." (Emphasis added.) Malek's argument fails. Although the article does indeed contain the words "strategic options," reading the headline and article in its entirety clearly demonstrates that the Bloomberg article was indisputably about the *sale* of ERT. Thus, Corrigan's statement that the article was not true was not a material misrepresentation given that the article concerned a sale that was not being contemplated when the article was published and a sale that, in fact, never happened.

### b.     No Fraudulent Intent

{¶ 31} Malek also produced no evidence that Corrigan intended to defraud or mislead him into voluntarily resigning in June 2019, or to forego exercising his stock options in August 2019, when he said during a meeting in March 2019, that the Bloomberg article was not true. Fraud is not established unless the person makes the misrepresentation with knowledge of its falsity and with the intent of misleading another to rely on it. *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 56, 514 N.E.2d 709 (1987).

{¶ 32} Malek's case is based on his "hunch" that the appellees knew about the Astorg transaction and were purposely misleading him because, as alleged in his complaint, "[m]ulti-billion dollar transactions do not appear out of thin air. They require months of planning, negotiations, and diligence." But fraudulent conduct cannot be established by mere conjecture; it must be proved by direct evidence or

justifiable inferences from established facts. *Seitz v. Harvey*, 2d Dist. Montgomery No. 25867, 2015-Ohio-122, ¶ 43.

{¶ 33} Malek's suspicions are insufficient to create a genuine issue of material fact regarding any fraudulent intent. Rather, the evidence demonstrates that when the Bloomberg article came out on March 4, 2019, many of the details in the article were incorrect. Further, the evidence demonstrates that Corrigan's statement about the Bloomberg article was not made directly to Malek; it was made to a group of ERT employees during a regularly scheduled meeting. Finally, it is undisputed that Corrigan asked Malek to stay on at ERT even after he had decided to resign, *a fact that in itself negates the element of intent*. Quite simply, there is no evidence that Corrigan intended that Malek rely on a statement made during a group meeting in March 2019 in deciding to resign from ERT in May 2019, and not exercise his stock options in August 2019, some five months after the statement was made.

{¶ 34} Malek suggests in his appellate brief, as he argued in his brief opposition to appellees' motion for summary judgment, that Corrigan's concealment of the initial discussions with Astorg indicates fraudulent intent, as demonstrated by his testimony that he had the Astorg representatives pose as Nordic personnel for the March 7, 2019 meeting. But the two cases Malek cites in support of his argument that concealment is an indication of fraudulent intent and a "badge of fraud" do not support his common law fraud claim. In *Harrison v. Creviston*, 168 Ohio App.3d 349, 354, 860 N.E.2d 113 (8th Dist.2006), the court simply noted that concealing the transfer of money shortly before or after incurring

a substantial debt is a "badge of fraud" for purposes of determining whether a fraudulent transfer occurred pursuant to R.C. 1336.04(B). *Richardson v. Commr.*, 509 F.3d 736 (6th Cir.2007), involved a party who fraudulently underreported taxes in violation of a federal statute. Both cases are inapplicable here because neither case discusses common law fraud under Ohio law or a factual scenario even remotely similar to this case.

{¶ 35} Malek also contends that Corrigan's testimony that he believed the Bloomberg article was a "distraction" to ERT employees and that he wanted to keep the focus on growing the company rather than the rumor and distraction created by the article demonstrates fraudulent intent. We disagree. As discussed above, the article contained numerous inaccuracies. Being inaccurate and being a distraction are two different things. Corrigan's desire to keep employees focused on growing ERT rather than the distraction created by the article does not render the article true, and his desire to avoid the distraction created by the article does not support Malek's assertion that Corrigan intentionally misrepresented the article's veracity.

{¶ 36} Malek also suggests that the board member's email to Corrigan and another board member after the article was published that "it was not good to have this story out there," and Corrigan's response that the article would "be a distraction for a few days," demonstrates that Corrigan's statement about the Bloomberg article was untrue. Again, whether the article was a distraction does not make it true, nor make Corrigan's statement that the article was "unfounded" a misrepresentation.

{¶ 37} In short, there is no evidence in the record from which a jury could conclude that Corrigan intended to defraud Malek or induce him to act on the representation.

### c.     No Justifiable Reliance

{¶ 38} Next, we find that Malek produced no evidence of any justifiable reliance on Corrigan's March 5, 2019 statement in his decision to resign from ERT in May 2019, and let his stock options expire some five months later. In fact, Malek testified that he left ERT, despite being asked to stay, because he was fearful of his future at the company after he was put on a performance improvement plan and was concerned about his job security. In his resignation letter, Malek confirmed that he left ERT "based on the fact that I know you lost faith in my ability to manage the commercial imaging team." Thus, the undisputed evidence demonstrates that Malek did not leave ERT because of or in reliance on Corrigan's statement; he left because he was worried about his job.

{¶ 39} The evidence also demonstrates that Malek's decision to not invest over $500,000 in ERT and timely exercise his stock options within 60 days after he resigned from ERT is because he mistakenly believed he had six months after his resignation to exercise his options. On October 28, 2019, Malek sent Nuckols a text message in which he stated that he had six months to exercise his options, and on October 29, 2019, Malek asked his financial planner to find a lender who could "pull the $518,779" Malek believed he needed to exercise his options. However, as Malek now admits, by then it was too late; his options had expired 60 days after his

voluntary resignation from ERT. Malek's text makes clear that his decision to not timely exercise his options was not based on Corrigan's March 5, 2019 statement about the Bloomberg article; it was based on his misunderstanding regarding how long he had to exercise his options.

{¶ 40} The absence of any element of a fraud claim precludes recovery. *Minaya v. NVR, Inc.,* 8th Dist. Cuyahoga No. 105445, 2017-Ohio-9019, ¶ 12. Because Malek did not produce evidence demonstrating there was a genuine issue of fact regarding all the elements of his fraud claim against Corrigan, the trial court properly granted summary judgment to appellees on this claim.

### a. Malek's Negligent Misrepresentation Claim Against Nuckols

{¶ 41} Malek next challenges the trial court's grant of summary judgment to Nuckols on his negligent misrepresentation claim.

{¶ 42} In *Delman v. Cleveland Hts.*, 41 Ohio St.3d 1, 534 N.E.2d 835 (1989), the Ohio Supreme Court set for the elements of negligent representation as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Id.* at 4. Thus, "the elements of a negligent misrepresentation claim 'require (1) a defendant who is in the business of supplying information; and (2) a plaintiff who sought guidance with respect to his business transactions from the defendant.'" *Hamilton v. SYSCO Food Servs. of Cleveland*, 170 Ohio App.3d 203, 2006-Ohio-

6419, 866 N.E.2d 559, ¶ 20 (8th Dist.), quoting *Nichols v. Ryder Truck Rental, Inc.*, 8th Dist. Cuyahoga No. 65376, 1994 Ohio App. LEXIS 2697 (June 23, 1994).

{¶ 43} In his complaint, Malek alleged that Nuckols falsely represented in March 2019 that the Bloomberg article was false, ERT was not close to an exit plan because too much work needed to be done to improve ERT's operations, and the $2.5 billion valuation was inaccurate and too low.  Malek further alleged that he spoke with Nuckols on four separate occasions between June 27, 2019, and the end of August and, each time, Nuckols told him that ERT had no transaction in sight that would result in his stock options having value for at least 12 to 18 months.  We find that the trial court properly granted appellees' motion for summary judgment regarding this claim.

{¶ 44} First, any statements that Nuckols allegedly made while Malek was an employee of ERT are not actionable under a claim of negligent misrepresentation.  In *Nichols*, this court specifically rejected the application of the tort of negligent misrepresentation in the employer – employee context because an employer is not in "the business of supplying information for the guidance of others." *Id*. at 11.  This court reasoned that the class of persons "who are in the business of supplying information for the guidance of others typically include attorneys, surveyors, abstractors of title and banks dealing with no-depositors' checks." *Id*. at 11-12.  Further, the court found that "no court in Ohio has held the tort of negligent misrepresentation applicable to the employer – employee relationship." *Id*. at 12.  Accordingly, we find that the trial court properly granted

summary judgment to appellees on Malek's misrepresentation claim regarding any statements made by Nuckols prior to June 28, 2019, when Malek resigned from ERT.

{¶ 45} We likewise find that the trial court properly granted summary judgment on Malek's misrepresentation claim with respect to any statements by Nuckols in July and August 2019, because it is undisputed that Nuckols is not "in the business" of supplying information about stock options.

{¶ 46} Malek contends, however, that this case involves a "transaction in which Nuckols had a pecuniary interest"; i.e., that Nuckols, as a participant in ERT's stock plan, had a pecuniary interest in any pending transaction involving ERT that would affect the value of his stock. Malek asserts that this is the "second type of negligent misrepresentation claim" identified in *Delman*, *supra*, as opposed to the "first type" involving representations made in the course of a "business, profession, and employment," and thus, he contends that the trial court improperly granted summary judgment on this claim.

{¶ 47} Malek cites *Barr v. Lader*, 8th Dist. Cuyahoga No. 87514, 2007-Ohio-156, in support of this argument. *Barr* does not support Malek's argument that the trial court improperly granted summary judgment in favor of Nuckols on his claim, however. The question in *Barr* was whether the plaintiff had adequately pleaded a cause of action for negligent misrepresentation against a corporation and its officers sufficient to withstand a Civ.R. 12(B)(6) motion to dismiss for failure to state a claim upon which relief may be granted. *Id.* at ¶ 14. The issue here, however, is whether

Malek produced any evidence in response to appellees' motion for summary judgment to create a genuine issue of material fact regarding his negligent misrepresentation claim against Nuckols. We find that he did not.

**{¶ 48}** Malek admitted that he had no evidence that Nuckols knew of the Astorg transaction in the summer of 2019 when he spoke with him (Malek Dep., p. 85), and in fact, Nuckols testified that he had no knowledge of the transaction until September 8, 2019, when Corrigan told him and other members of the executive management team to fly to Boston for a meeting on September 9, 2019, where they were advised of the potential transaction. (Nuckols Dep., p. 29-30). Malek fails to explain or offer any evidence regarding how Nuckols could have an interest in June, July, and August 2019, in a "transaction" that he knew nothing about and that did not even exist when his statements were made. Furthermore, Malek testified that he did not speak with Nuckols in a business capacity relative to his stock options (Malek Dep., p. 78), but rather, that he and Nuckols informally discussed their children, the state of ERT, and Malek's "hunch" that there was some financial transaction on ERT's horizon. Even assuming, as Malek argues, that this case involves the "second type" of negligent misrepresentation claim, there is no evidence that Nuckols's statements were made in the context of a "transaction in which he had a pecuniary interest," and thus, they cannot form the basis for a negligent misrepresentation claim.

**{¶ 49}** Furthermore, Nuckols's statements are not actionable because they were merely his opinion and prediction regarding a future event. Malek testified

that Nuckols told him that exercising his options was "up to you. I can't make that call" but "they're not going to be worth anything for at least 12 to 18 months." (Malek Dep., p. 74.) Negligent misrepresentation claims "require misrepresentations of past or existing facts, not promises or representations relating to future actions or conduct." *Telxon Corp. v. Smart Media of Del., Inc.*, 9th Dist. Summit No. 22098, 2005-Ohio-4931, ¶ 33. Nuckols's statements, made in light of a transaction he knew nothing about, were nothing more than his opinion and prediction about what could happen in the future and thus cannot form the basis for a negligent misrepresentation claim.

{¶ 50} Last, there is no evidence to support Malek's claim that Nuckols acted negligently in supplying him with confidential corporate information after he resigned, in violation of ERT policy. Malek contends that ERT's prohibition against sharing business information with former employees applies to information regarding whether it is pursuing business transactions and thus, "by providing [him] with false information about the pending transaction, Nuckols violated corporate policy * * * and acted negligently." However, there is no evidence whatsoever that Nuckols knew about the Astorg transaction during his conversations with Malek in the summer of 2019 and therefore, nothing to support Malek's assertion that Nuckols gave him false information about the transaction.

{¶ 51} To summarize, the record reflects that Malek failed to produce any evidence to create a genuine issue of material fact regarding either his fraud claims against Corrigan or his negligent misrepresentation claim against Nuckols.

Accordingly, the trial court properly granted summary judgment to appellees on both claims. The first assignment of error is overruled.

### B. Civ.R. 12(C) Ruling

{¶ 52} In his second assignment of error, Malek contends that the trial court erred in granting Kulbago's Civ.R. 12(C) motion for judgment on the pleadings regarding his fraud claim.

{¶ 53} Motions for judgment on the pleadings are governed by Civ.R. 12(C), which states that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." To be entitled to a dismissal under Civ.R. 12(C), "it must appear beyond doubt that [the nonmovant] can prove no set of facts warranting the requested relief, after construing all the material factual allegations in the complaint and all reasonable inferences therefrom in [the nonmovant's] favor." *State ex rel. Toledo v. Lucas Cty. Bd. of Elections*, 95 Ohio St.3d 73, 74, 765 N.E.2d 854 (2002). We review a ruling on a motion for judgment on the pleadings de novo. *DiGorgio v. Cleveland*, 8th Dist. Cuyahoga No. 95945, 2011-Ohio-5878, ¶ 19.

{¶ 54} The entirety of Malek's allegations against Kulbago are as follows:

Not long after that meeting [referring to the March 5, 2019 management meeting], Mr. Malek asked Tim Kulbago, ERT's Imaging Produce Line Executive and a member of the Executive Management Team, about any possible sale involving ERT. Mr. Kulbago and Mr. Corrigan had a close working relationship, including weekly one-on-one meetings. They also golfed outside of work. Mr. Malek brought up a rumor circulating in the Company that Mr. Corrigan was courting potential buyers and investors. Mr. Kulbago responded that the Bloomberg article was completely untrue and that he would know if the

CEO was courting potential buyers or investors because he knew what meetings were on Mr. Corrigan's calendar.

(Complaint, ¶ 30.)

**{¶ 55}** As discussed above, in accordance with Civ.R. 9(B), claims of fraud must be pled with particularity. The rule "places a higher burden than is normally required upon the person asserting such a claim to support general allegations with specific facts." *Reasoner v. State Farm Mut. Auto. Ins. Co.*, 10th Dist. Franklin No. 01AP-490, 2002-Ohio-878, ¶ 20-21.

> To comply with the Civ.R. 9(B) requirement, "'the pleading must contain allegations of fact which tend to show each and every element of a cause of action for fraud.'" *Parmatown S. Assn. v. Atlantis Realty Co.*, 8th Dist. Cuyahoga No. 106503, 2018-Ohio-2520, ¶ 7, quoting *Minaya v. NVR Inc.*, 2017-Ohio-9019, 103 N.E.3d 160, ¶ 11 (8th Dist.). "This means that a defendant must state 'the time, place, and content of the false representation, the fact misrepresented, and the nature of what was obtained or given as a consequence of the fraud.'" *Cord v. Victory Solutions, L.L.C.,* 8th Dist. Cuyahoga No. 106006, 2018-Ohio-590, ¶ 14, quoting *Carter Jones Lumber Co. v. Denune*, 132 Ohio App.3d 430, 433, 725 N.E.2d 330 (10th Dist.1999). Such particularity is required to both apprise the opposing party of the act that is the subject of the fraud claim and to allow the opposing party to prepare an effective defense. *Turner v. Salvagnini Am., Inc.*, 12th Dist. Butler No. CA 2007-09-233, 2008-Ohio-3596, ¶ 26.

*Fast Tract Title Servs.*, 8th Dist. Cuyahoga No. 110939, 2022-Ohio-1943 at ¶ 12.

**{¶ 56}** Malek's fraud claim against Kulbago was clearly not pled with sufficient particularity. Its vague allegation that Malek spoke with Kulbago "not long after" the March 5, 2019 meeting does not sufficiently plead the date, time, and place of the alleged fraudulent misrepresentation.

**{¶ 57}** Likewise, there are no specific allegations that Kulbago knew the Bloomberg article was false and that he intended to mislead Malek when he told him

the article was not true. In fact, in his answer, Kulbago admitted that he was advised by ERT's executive vice president in an email dated March 5, 2019, that the Bloomberg article was "based on rumours [sic] and needs to be ignored." But even without considering Kulbago's answer, it is apparent that Malek alleged no facts that Kulbago knowingly misrepresented information about the Bloomberg article with the intent to mislead him into relying on the statement.

{¶ 58} Likewise, there are no specific allegations that Malek relied on Kulbago's representation in March 2019 in deciding to leave ERT and not timely exercise his stock options. In fact, Malek alleges in the complaint that he relied on *Nuckols's* representations in declining to exercise his stock options. (Complaint, ¶ 40.)

{¶ 59} Finally, Malek made no specific allegation that Kulbago knew about the Astorg transaction in March 2019 such that his statement about the Bloomberg article was untrue. Malek's fraud claim against Kulbago, like his fraud claim against the other defendants, is based on mere conjecture that it would have been impossible for Kulbago, as a senior executive at ERT, not to have known about any pending transaction involving ERT and that his statement about the Bloomberg article must therefore have been untrue. But as discussed above, a fraud claim cannot be based on conjecture; it must be supported with specific facts establishing each element of the claim. Malek's complaint failed to do so with respect to Kulbago; it simply lumped him in with the other defendants without allegations of fraud relating specifically to him.

**{¶ 60}** Accordingly, because Malek failed to plead his fraud claim against Kulbago with the requisite particularity required by Civ.R. 9(B), the trial court did not err in granting Kulbago's Civ.R. 12(C) motion for judgment on the pleadings.

**{¶ 61}** The second assignment of error is overruled.

**{¶ 62}** Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, PRESIDING JUDGE

MARY EILEEN KILBANE, J., and
EMANUELLA D. GROVES, J., CONCUR