[Cite as *Durnell's RV Sales, Inc. v. Beckler*, 2023-Ohio-3565.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

DURNELL'S RV SALES INC.,

    PLAINTIFF/APPELLEE,                  CASE NO. 8-22-40

    v.

LISA BECKLER, ET AL.,

    DEFENDANTS/APPELLANTS,
    -and-                              O P I N I O N

DAVID DURNELL, ET AL.,

    THIRD-PARTY DEFENDANTS/
    APPELLEES.

**Appeal from Logan County Common Pleas Court
Trial Court No. CV 20 06 0135**

**Judgment Affirmed**

**Date of Decision:  October 2, 2023**

**APPEARANCES:**

    *Michael T. Cox* **for Appellants**

    *Terrence G. Stolly* **for Appellees**

**WILLAMOWSKI, J.**

{¶1} Defendants-appellants Lisa and Martin Beckler (collectively "the Becklers") appeal the judgment of the Logan County Court of Common Pleas, arguing that the trial court erred in granting summary judgment in this case. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} David Durnell ("Durnell") is a part owner of Durnell's RV Sales, Inc., doing business as RV Wholesalers ("RVW"). In 2019, Lisa Beckler ("Lisa") and Martin Beckler ("Martin") were seeking to acquire a recreational vehicle and found a type of camper that they were interested in purchasing. Lisa described what happened next as follows:

> We had found a camper we liked, I believe it was in the Youngstown area, and we were looking, making a final decision on what one we wanted to purchase.
>
> And on—I'm on numerous pages on Facebook, camping pages, and I had seen somebody post that RVW would beat any price, any quote you brought them. So I had messaged them saying we have this camper, you know, are you able to order it? What would be the cost?

(Lisa Depo. 10). She affirmed that the reason she reached out to RVW "was based upon the price of the unit" and that no "other factors steered [them] * * * toward RV Wholesalers[.]" (*Id*. at 11).

{¶3} In response, RVW indicated that it could procure such a camper and offered the Becklers a Wildwood FSX recreational vehicle at a price of $11,898.00.

The initial price of this unit was $15,898.00, but RVW gave the Becklers an allowance that reduced the price by $4,000.00. On April 29, 2019, Lisa signed a "Purchase Order/Purchase Agreement" for a 2020 Wildwood FSX recreational vehicle that included the following provision:

> When taking delivery at your destination, we encourage a complete inspection of your new unit at the time of delivery—as only the damage that is noted at time of delivery will be the responsibility of RVW. Items reported after will fall under the manufacturers warranty.
>
> * * *
>
> Understand that the warranty is through the manufacturer of the RV. RVW will aid in facilitating the manufacturers warranty but in no way should or will this imply that any part of the RV is warranted by RV Wholesalers or Durnell's RV Sales Inc. Sign below showing I understand the warranty is through the factory and that RV Wholesales will help me get the warranty covered to the best of their ability, but that they are not responsible for the 'manufacturers limited warrant' in any way.

(Doc. 136, Ex. N). Forest River, Inc. ("Forest River") was the manufacturer of the unit that the Becklers purchased from RVW. Since the Becklers lived several hours away from RVW's place of business, they opted to have RVW deliver the recreational vehicle to their house rather than pick it up at RVW.

{¶4} On April 29, 2019, Lisa also tendered a deposit of $1,000.00 to RVW. The associated paperwork stated that the deposit "obligates Durnell's RV Sales Inc. to refrain for a period of one day from offering for sale to any other customer the recreational vehicle to which this deposit relates." (Doc. 136, Ex. N). This

paperwork further explained that "[a] deposit of $1,000.00 is required for any purchase of a new unit with our company." *Id*.

{¶5} On May 16, 2019, Martin completed a set of documents that finalized the purchase of the recreational vehicle from RVW. As part of this process, Martin signed a document entitled "Disputes Addendum" on May 16, 2019. Section Three of the Disputes Addendum reads as follows:

> Prohibited Actions and Liquidated Damages. You, the Customer, expressly agree to not make any libelous, false or misleading comments, remarks or communications regarding RVW. You, the Customer, expressly agree that breach of this term shall result in substantial economic damage to RVW in the form of lost business, for which damages will be difficult to accurately calculate. You, the Customer, expressly agree that in the event You breach this term, RVW shall be entitled to Five Thousand Dollars ($5,000.00), not as a penalty, but as liquidated damages per breach, immediate injunctive relief, all costs and reasonable attorney fees, and any other relief to which RVW may be entitled at law or in equity. This provision shall be interpreted so as to comply with all applicable federal and state laws, including without limitation, the 'Consumer Review Fairness Act of 2016.'

(Doc. 136, Ex. 8). Martin also signed several other documents at this time, including a waiver of the offer to purchase several additional items from RVW; a Declaration of Warranty and Service Cooperation; and a document that explained RVW's Buckeye Service Guarantee.

{¶6} On May 17, 2019, the recreational vehicle was delivered to the Becklers' home. Shortly thereafter, Lisa noticed a sticker that indicated the recreational vehicle had been manufactured in February. She later testified that this

sticker made her wonder whether she had received a Wildwood FSX recreational vehicle with a 2020 model year or one with a 2019 model year. She also noticed a scratch on the refrigerator door; an issue with a set of blinds; a scratch on the screen door; and a tear in the linoleum. This tear was apparently caused by a slide piece that was scraping against the floor.

{¶7} On May 17, 2019, Lisa sent an email to RVW that read, in its relevant part, as follows: "the manufacture date on this is Feb. wasn't this just made? There are some scratches on the fridge, wall, and inside door." (Lisa Depo. Ex. 1). Around this time, the Becklers decided to make several modifications to their recreational vehicle. These modifications included adding curtains to the bunkbeds and hanging several shelves. On May 29, 2019, RVW responded to Lisa, asking for her to email pictures of the issues that she had mentioned.

{¶8} Shortly after the delivery of the vehicle, an RVW employee, Trevor Watt ("Watt"), was working on obtaining a title for the Becklers' recreational vehicle. Once he received the vehicle identification number ("VIN"), Watt noticed that their recreational vehicle had a 2019 model year rather than a 2020 model year. Watt then attempted to call the Becklers to notify them of this discrepancy but was unable to reach them. He and the Becklers ended up "play[ing] phone tag" for a time. (Watt Depo. 16).

{¶9} After several attempts to contact RVW staff, Lisa made an online post about this situation that came to Durnell's attention. On June 5, 2019, Durnell

contacted Lisa via text message, indicating that he would work to resolve this issue. He also asked her to take down the online post. Lisa agreed to remove the post but informed Durnell that she believed their recreational vehicle was a 2019 model rather than a 2020 model. Durnell stated that, if she had received a 2019 model, then this was likely because "the factory filled your order with an existing old coach * * *." (Doc. 136, Ex. 8). He stated that, "i[f] that is the case and it is a 2019, we will make them give you a new unit." *Id.* Lisa inquired into whether they had received a used recreational vehicle. In response, Durnell explained that RVW does not "buy display units" or "buybacks." *Id.* Rather, RVW bought "[o]nly brand new" vehicles. *Id.*

{¶10} Lisa told him that they had already altered the recreational vehicle for their use. Durnell then contacted the manufacturer and was able to confirm that the Becklers had received a 2019 model. He also reported that the manufacturer was not willing to take the recreational vehicle back because of the alterations that the Becklers had made. Durnell admitted that it was "[n]ot fair to think you are getting [a] 2020 and be handed a 2019." (Doc. 136, Ex. 8). He also indicated that the difference in price between a 2019 model and a 2020 model was $1,500.00.

{¶11} Durnell then said that RVW would give the Becklers $1,500.00 if they chose to retain their 2019 model or would give them a new 2020 model if they wanted to return their 2019 model to RVW. In response to this offer, Lisa stated the following:

So taking the 2020 we just get what we were originally suppose[d] to get but lose money on all our time [a]nd effort and things we have attached and set up for the camper? We used vacation time getting it all set up and lots of other time. He's [Martin] just suppose[d] to go back and spend twice as much taking everything apart and unscrewing everything and then have to start all over?

(Doc. 136, Ex. 8). Lisa later reiterated this point, saying:

So if you give us new how does that help other than giving us what we were suppose[d] to get originally? That is what we bought. It's doing nothing to say sorry for the time you have lost and will now lose getting everything ready again. We * * * work and have kids in sports. We literally spent hours/days getting it all ready. And if we take the $1500 it just is what we were suppose[d] to pay. Doesn't fix scratches and broken blinds.

*Id.* In response, Durnell stated that he would ask the manufacturer to give them $500.00 in addition to the $1,500.00 that had already offered to the Becklers if they chose to keep the 2019 model. However, after the manufacturer refused to pay this amount, Durnell told Lisa that RVW would give them "a full $2,000 * * *[.]" *Id.* Lisa replied, "Ok. I guess the $2,000.00 is fine." *Id.*

{¶12} On June 7, 2019, Durnell contacted Lisa and stated that RVW sent out the check and title to the vehicle. On June 11, 2019, Lisa confirmed receipt of these items. Two weeks later, Lisa messaged Durnell about the warranty issues. She had already mentioned a scratch on the refrigerator door and a damaged set of blinds. On this occasion, she mentioned the issue with the slide dragging on the linoleum and tearing the flooring. Durnell stated that RVW would "adjust the slide out" and "replace the flooring." (Doc. 136, Ex. 8).

{¶13} Durnell and Lisa began to discuss when these repairs could be scheduled. Lisa mentioned that they had planned several trips in their recreational vehicle and lived several hours away from RVW. She asked whether the Buckeye Service Guarantee meant that RVW would pick up their recreational vehicle for free. Durnell indicated that RVW offers "free delivery in Ohio when you buy" and will pick up a recreational vehicle for service "if your RV cannot be moved." (Doc. 136, Ex. 8). He then stated: "It doesn't cover back and forth for service." *Id*. However, Durnell then added, "I am happy to come and get it. Le me know if we are doing it now or waiting please." *Id*.

{¶14} While trying to find a time to schedule the repairs, Lisa stated, "We are just starting our camping season as baseball and softball are ending for my kids." (Doc. 136, Ex. 8). Lisa also asked if RVW could have the repairs completed within one week while the Becklers were in between scheduled trips. She later stipulated that they would "need it back next week." *Id*. Durnell replied, "Not sure about the timing. I will look at the schedule. Depends on parts as well." *Id*. He again mentioned that "parts are quite hard to get." *Id*.

{¶15} On September 27, 2019, Lisa messaged Durnell, saying, "I wanted to go ahead and get everything set up now to get fixed. Looking at the week of [O]ct. 14. I know you needed time before to get parts and get it scheduled." (Doc. 136, Ex. 8). In response, Durnell asked if the Becklers had winterized the recreational vehicle because RVW was "waiting forever for parts," and it "[m]ight turn cold

before it is back." *Id.* Lisa indicated that they had planned trips in October and have "normally" gone camping in November. *Id.* Durnell stated that RVW could pick up the recreational vehicle when the Becklers had finished camping for the year.

{¶16} Lisa then asked if RVW could conduct the repairs in between their October and November camping trips. Durnell replied, "That wont [sic] work. We cannot get parts that quick. I know it wont [sic] work. Sorry, factory parts are just REALLY slow right now." (Doc. 136, Ex. 8). Lisa stated, "Ugh very frustrating. You had said only a few days needed. That's why we waited for you to be less busy." *Id.* Durnell then explained that "[i]t has nothing to do with us, we are ready for you. The only issue will be the availability of parts." *Id.* When Lisa asked whether the recreational vehicle could be returned within a month, Durnell replied, "I cant [sic] honestly say that. Parts are just crazy. I am sorry! I will do everything in my power to make it happen however." *Id.*

{¶17} Lisa and Durnell then arranged for RVW to pick up the recreational vehicle from the Becklers' house on October 14, 2019. Lisa subsequently inquired into the progress on the repairs on October 22, 2019. Durnell gave the following update: "Waiting on parts right now. No idea when they will be in. Factory is not giving shipping dates. We will continue to follow up and push the factory for a quick fulfillment." (Doc. 136, Ex. 8). On October 25, 2019, Durnell reported that

RVW was only waiting on the parts to fix the linoleum and the screen door. He indicated that the rest of the repairs were complete.

{¶18} On November 18, 2019, Durnell texted Lisa to inform her that the repair projects were completed. RVW then returned the recreational vehicle to the Becklers' house. On November 22, 2019, Lisa texted Durnell the following: "Camper looks great. Thanks for all the help!" (Doc. 136, Ex. 8). No messages were exchanged until June 10, 2020 when Lisa contacted Durnell about an issue with the flooring. She stated: "So we used our camper for the first time since you guys fixed it. The slide ripped the floor again." *Id*. In response, Durnell directed her to contact the service department. However, the recreational vehicle was no longer under the factory warranty.

{¶19} On June 15, 2020, Lisa sent a series of messages to Durnell. She stated that the floor "was having this problem when still under warranty and you guys kept it for weeks." (Doc. 136, Ex. 8). She also stated that the repair "should be covered because it was never fixed by you guys in the first place." *Id*. Durnell stated that the floor "was fixed, we tested it several times. We will just both have to fight with the factory. I am sure together we can get it done." *Id*. Lisa stated, "I think you should support the products you sell/service and not just push it back on the factory. Your service people didn't fix it after having it for weeks." *Id*. Durnell replied:

> We fixed it. Period and end of story. With a slide out if you hit pothole, road debris, etc. and it is out of alignment. Many things can

put it out of alignment.  We tried your slide over 10 times to ensure that it was good.

*Id.*  Lisa replied, "Very poor customer service."  *Id.*  Durnell then told Lisa that "insulting people is not the way to get help."  *Id.*

{¶20} Lisa then called her recreational vehicle a "lemon that sat around"; said that she was "very unhappy from the start"; and that they have never had "issues like this."  (Doc. 136, Ex. 8).  The following exchange then occurred:

> [Durnell:] * * * This is it.  One more insult and we are done.  So sorry you are such an unhappy person, but I'm not your whipping boy.  Call the factory and RIP them, they built it.
>
> * * *
>
> [Lisa:]  You are just pushing it off on the factory.  Ok We can be done.  I will make sure everyone on all the sale pages know to not deal with you.
>
> [Durnell:]  You post one negative thing and we will absolutely come after you with our full legal team.  We wont [sic] stop either.  We went way above and beyond for you and are now.  But we wont [sic] be insulted while doing it.  The factory built it and it is there [sic] warranty.  They make the decisions.
>
> [Lisa:]  You are allowed to post reviews and earn [sic] others.  It will all be the truth.
>
> [Lisa:]  I'm done with you.
>
> [Lisa:]  No more since you don't want to help. * * *
>
> [Durnell:]  I hope it is worth the financial costs.  Yep, we dont [sic] want to help…your [sic] just pissed because you cant [sic] call an vent and take out your anger on us.  Do what you need, just understand we will defend ourselves and will come full force.

[Durnell:] Go away now. Call and kick your husband.

[Durnell:] Thank you Lisa. This should be fun. Paperwork will arrive soon. Gonna be a very expensive review.

(Doc. 136, Ex. 8). Lisa then wrote an online post in a Facebook group called "Ohio RV and Camping Group." (Lisa Depo., Ex. 2). This post of several hundred words began as follows: "Just want to give everyone a warning and review to not purchase from RV Wholesalers in Lakeview, Ohio. It has been a year of issues and lack of service." *Id*.

{¶21} In response to this post, RVW filed a complaint against the Becklers on June 26, 2020, raising claims of defamation, tortious interference with business relations, and breach of contract. On June 29, 2020, the Becklers traded-in their Wildwood FSX recreational vehicle at Rhone's RV ("Rhone's") in Cogan Station, Pennsylvania. They received a $13,000.00 trade-in allowance from Rhone's in exchange for the recreational vehicle that they had purchased from RVW. The Becklers then obtained a different recreational vehicle from Rhone's.

{¶22} On July 28, 2020, the Becklers filed an answer and third-party complaint that named Durnell as a third-party defendant. The Becklers raised counterclaims and third-party claims that asserted causes of action for violations of the Ohio Consumer Sales Practices Act ("CSPA"); fraud; negligence and negligent misrepresentation; breach of contract; intentional infliction of emotional distress; defamation; and declaratory judgment. On December 10, 2021, RVW filed a

motion for partial summary judgment. RVW sought summary judgment on its defamation claim and on the Becklers' counterclaims. On January 7, 2022, The Becklers filed a motion to oppose partial summary judgment.

{¶23} On June 9, 2022, the trial court issued a seventy-four-page judgment entry that granted in part and denied in part the plaintiff's motion for partial summary judgment. In its decision, the trial court granted summary judgment in favor of RVW on all counterclaims and third-party claims raised by the Becklers. However, the trial court denied RVW's motion for partial summary judgment as to its defamation claim.

{¶24} On December 15, 2002, the trial court issued a Civ.R. 54(B) certification for its June 9, 2022 judgment entry. The Becklers filed their notice of appeal on December 15, 2022. On appeal, they raise the following four assignments of error:

### First Assignment of Error

**The trial court errored [sic] in determining that the plaintiff met its initial burden under Rule 56.**

### Second Assignment of Error

**The trial court errored [sic] in determining that various actions by plaintiffs were not deceptive, unfair, and/or unconscionable under the Ohio Consumer Sales Practices Act.**

**Third Assignment of Error**

**The trial court errored [sic] in finding that Defendants did not rely upon plaintiff's fraudulent misrepresentation.**

**Fourth Assignment of Error**

**The court errored [sic] in finding no breach of contract by the plaintiff.**

*First Assignment of Error*

{¶25} The Becklers raise several general arguments against the trial court's decision to grant summary judgment on their counterclaims.

Legal Standard

{¶26} "Appellate courts consider a summary judgment order under a de novo standard of review." *Schmidt Machine Company v. Swetland*, 3d Dist. Wyandot No. 16-20-07, 2021-Ohio-1236, ¶ 23. Under Civ.R. 56,

> **[s]ummary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law * * *. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.**

Civ.R. 56(C). Accordingly, summary judgment is to be granted

> **only when it is clear '(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as**

**a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.'**

*Beair v. Management & Training Corp.*, 3d Dist. Marion No. 9-21-07, 2021-Ohio-4110, ¶ 15, quoting *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46, 47 (1978).

**{¶27}** "Initially, '[t]he party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.'" *New Technology Products Pty Ltd. v. Scotts Miracle-Gro Co.*, 3d Dist. Union No. 14-21-22, 2022-Ohio-3780, ¶ 33, quoting *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 370, 1998-Ohio-389, 696 N.E.2d 201, 204 (1998). "In doing so, the moving party is not required to produce any affirmative evidence, but must identify those portions of the record which affirmatively support his argument." *Neal v. Treglia*, 2019-Ohio-3609, 144 N.E.3d 1045, ¶ 12 (3d Dist.), quoting *Carnes v. Siferd*, 3d Dist. Allen No. 1-10-88, 2011-Ohio-4467, ¶ 13.

**{¶28}** If the moving party carries this initial burden, "[t]he burden then shifts to the party opposing the summary judgment." *Bates Recycling, Inc. v. Conaway*, 2018-Ohio-5056, 126 N.E.3d 341, ¶ 11 (3d Dist.), quoting *Middleton v. Holbrook*, 3d Dist. Marion No. 9-15-47, 2016-Ohio-3387, ¶ 8. "In order to defeat summary judgment, the nonmoving party may not rely on mere denials but 'must set forth

specific facts showing that there is a genuine issue for trial.'" *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 10, quoting Civ.R. 56(E).

**{¶29}** "[B]ecause summary judgment is a procedural device to terminate litigation, it must be awarded with caution." *Williams v. ALPLA, Inc.*, 2017-Ohio-4217, 92 N.E.3d 256, ¶ 6 (3d Dist.), quoting *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-359, 1992-Ohio-95, 604 N.E.2d 138 (1992). "The court must thus construe all evidence and resolve all doubts in favor of the non-moving party * * *." *Webster v. Shaw*, 2016-Ohio-1484, 63 N.E.3d 677, ¶ 8 (3d Dist.). A trial court is not limited to examining the materials attached to the motion for summary judgment but "may examine *all* evidence properly before it. Such evidence may include pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts and written stipulations of fact." (Emphasis sic.) *Jackson v. Alert Fire and Safety Equipment, Inc.*, 58 Ohio St.3d 48, 51, 567 N.E.2d 1027, 1031 (1991).

Legal Analysis

**{¶30}** The Becklers raise three main arguments that we will consider in our analysis of this assignment of error.[1] First, the Becklers argue that the fact that the

---

[1] The Becklers raise two other arguments in this assignment of error. First, the Becklers argue that the trial court failed to consider their CSPA claim that alleged a violation of Ohio Administrative Code ("OAC") 109:4-3-07. Second, the Becklers argue that the trial court erred in concluding that damages for emotional distress could not be award for CSPA violations. However, these two arguments are directly affected by our disposition of the Becklers' second assignment of error wherein they specifically challenge the trial court's decision to grant summary judgment on their CSPA claims. For this reason, we will address the CSPA claim that alleges a violation of OAC 109:4-3-07 as the fourteenth argument under the second assignment of error.

trial court relied on portions of the record that the moving parties did not specifically cite in their motion for summary judgment indicates that the moving party failed to carry its initial burden by identifying the portions of the record that support a grant of summary judgment. They assert that *Marshall v. Aaron*, 15 Ohio St.3d 48, 51, 472 N.E.2d 335 (1984) stands for the proposition that "a court may not *sua sponte* enter summary judgment on [a] basis not raised by Motion of a party." (Emphasis sic.) (Appellants' Brief, 4).

**{¶31}** However, as the appellee notes on appeal, the Becklers' argument relies on "an overreading of *Marshall*." Appellee's Brief, 8. In that case, the Ohio Supreme Court was addressing a situation in which the trial court granted summary judgment as to a party in the absence of that party moving for it. *Marshall* at 51. By contrast, in the case presently before this Court, RVW filed a motion for partial summary judgment. In deciding this motion, the trial court was not limited to considering only the evidentiary materials specifically cited in the text of RVW's motion. Rather,

> [a] court is not limited to review of the evidence urged by the moving party[ but] * * * must examine all evidence properly before the court, including the affidavits, pleadings, depositions, and answers to interrogatories to determine the existence or not of disputed material facts.

We will address the issue regarding whether damages for emotional distress can be awarded for CSPA claims as the fifteenth argument under the second assignment of error.

*Wicker v. Burger King*, 3d Dist. Allen No. 1-97-10, 1997 WL 232243, *1 (May 2, 1997). Thus, the trial court was permitted to conduct a thorough examination of the evidentiary materials in the record to confirm that no genuine issue of material fact existed for trial as to the claims identified in the motion for partial summary judgment. Thus, the first argument is without merit.

**{¶32}** Second, the Becklers assert that the trial court granted summary judgment as to all of their CSPA claims "in a wholesale and arbitrary manner." Appellants' Brief, 6. As part of this argument, the Becklers also assert that RVW did not address each of their CSPA claims in RVW's motion for partial summary judgment. However, RVW raised arguments that went to the core of the CSPA claims raised by the Becklers. RVW also identified portions of Lisa's deposition testimony and documents signed by Martin in support of these arguments in addition to filing multiple exhibits with its motion for partial summary judgment. From these arguments and evidentiary materials, the trial court had several bases from which it could evaluate the appropriateness of granting summary judgment on the Becklers' CSPA claims.[2]

**{¶33}** Further, in their motion in opposition to partial summary judgment, the Becklers listed fifty-six allegations. They argued that each of these allegations

---

[2] In their second assignment of error, the Becklers challenge the trial court's decision to grant summary judgment as to their CSPA claims. Thus, we will consider whether summary judgment was appropriate as to these CSPA claims in greater detail under the second assignment of error.

raised a CSPA claim that presented genuine issues of material fact. In its decision, the trial court stated that the Becklers

> took a shot-gun approach to responding to the Plaintiffs' motion by listing 56 alleged unfair or deceptive practices. There is little if anything about Defendants' interaction with Plaintiff and Plaintiff's counsel that Defendants do not claim to be unconscionable and/or deceptive and violative of the OCSPA. Further, many of Defendants' allegations are argumentative, redundant, conclusory, and/or made without reference to any supporting affidavit or deposition testimony.

(Doc. 169). Nonetheless, the trial court, in its seventy-four-page judgment entry, addressed all fifty-six allegations that were listed in the Becklers' motion. To verify whether any genuine issues of material fact existed for trial, the trial court thoroughly examined an extensive number of evidentiary materials that had been submitted by the Becklers and RVW with their respective motions. The trial court's handling of these CSPA claims was far from "wholesale and arbitrary." Appellants' Brief, 6. Thus, the second argument is without merit.

{¶34} Third, the Becklers assert that the trial court erred in considering damages in its decision. In its judgment entry, the trial court noted on several occasions that the Becklers received a trade-in allowance from Rhone's RV for their recreational vehicle that was greater than what the Becklers had initially paid to RVW for this unit. The Becklers assert that the trial court's reliance on this receipt to make this conclusion on damages was inappropriate, alleging that RVW did not raise this issue in its motion for partial summary judgment.

**{¶35}** However, RVW stated the following in its motion for partial summary judgment:

> The initial $4,000 discount, combined with the $2,000 payment for the model discrepancy led to the final price for Becklers of $9,898.99. According to Becklers' responses to RVW's second written discovery requests (attached hereto as Exhibit C), Becklers traded in the RV for $13,000 in June of 2020 after this lawsuit was filed, with alleged condition issues outlined below and after the Becklers had owned the RV for over a year.

(Doc. 135). Attached to this motion as Exhibit C was documentation from Rhone's, indicating that the Becklers traded in their 2019 Wildwood FSX, receiving credit of $13,000.00 for their 2019 model to put towards the purchase of another vehicle.

**{¶36}** In response, the Becklers did not present any evidence that would suggest that they had ultimately incurred any damages in this case. The Becklers also have not demonstrated how the trial court erred by relying on information that was properly before it in RVW's motion for partial summary judgment. Thus, the third argument is without merit. Accordingly, the Becklers' first assignment of error is overruled.

*Second Assignment of Error*

**{¶37}** The Becklers argue that the trial court erred by granting summary judgment on their CSPA claims.

Legal Standard

**{¶38}** The Ohio Consumer Sales Practices Act is found in Revised Code Chapter 1345. As "a remedial law which is designed to compensate for traditional

consumer remedies," this provision "must be liberally construed pursuant to R.C. 1.11." *Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27, 29, 548 N.E.2d 933, 935 (1990). The CSPA "prohibits suppliers from engaging in two types of practices." *Green Maple Enterprises, LLC v. Forrester*, 2021-Ohio-4640, 182 N.E.3d 1265, ¶ 16 (7th Dist.). These are "[1] unfair or deceptive acts or practices and [2] unconscionable acts or practices by suppliers in consumer transactions." *Loury v. Westside Automotive Group*, 2022-Ohio-3673, 199 N.E.3d 62, ¶ 22 (8th Dist.).

**{¶39}** "R.C. 1345.02 defines unfair or deceptive acts or practices in connection with consumer transactions." *Snapp v. Castlebrook Builders, Inc.*, 2014-Ohio-163, 7 N.E.3d 574, fn. 7 (3d Dist.). R.C. 1345.02(A) reads as follows:

> No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

"R.C. 1345.02(B) sets forth a non-exhaustive list of representations by a supplier that constitute deceptive acts or practices." *Anderson v. Discount Drug Mart*, *Inc.*, 2021-Ohio-693, 169 N.E.3d 252, ¶ 31 (8th Dist.). This list reads as follows:

> (1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;
>
> (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;
>
> (3) That the subject of a consumer transaction is new, or unused, if it is not;

(4) That the subject of a consumer transaction is available to the consumer for a reason that does not exist;

(5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not, except that the act of a supplier in furnishing similar merchandise of equal or greater value as a good faith substitute does not violate this section;

(6) That the subject of a consumer transaction will be supplied in greater quantity than the supplier intends;

(7) That replacement or repair is needed, if it is not;

(8) That a specific price advantage exists, if it does not;

(9) That the supplier has a sponsorship, approval, or affiliation that the supplier does not have;

(10) That a consumer transaction involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false.

R.C. 1345.02(B). "An act or practice is unfair if it is marked by injustice, partiality, or deception, or it results in inequitable business dealings." *Walker v. Dominion Homes, Inc.*, 164 Ohio App.3d 385, 2005-Ohio-6055, 842 N.E.2d 570, ¶ 25.

{¶40} "Generally, an act or practice is deceptive if it 'has the likelihood of inducing in the mind of the consumer a belief which is not in accord with the facts.'" *Walker* at ¶ 25, quoting *Funk v. Montgomery AMC/Jeep/Renault*, 66 Ohio App.3d 815, 823, 586 N.E.2d 1113 (1990). "For conduct to be 'deceptive' under the CSPA, it 'must be both false and material to the consumer transaction.'" *Anderson* at ¶ 30.

Although R.C. 1345.02 does not use the word 'falsity' or 'false,' each and every deceptive practice listed in the R.C. 1345.02 describes a

-22-

misrepresentation of the truth, i.e., a falsity. * * * [F]alsity is the essence of deception.

*Grgat v. Giant Eagle, Inc.*, 2019-Ohio-4582, 135 N.E.3d 846, ¶ 18 (8th Dist.).

Further, while

R.C. 1345.02 does not explicitly state that misrepresentations must be material to the transaction, it is well established that a deceptive act or practice under the CSPA is one that 'has the tendency or capacity to mislead consumers concerning a fact or circumstance *material* to a decision to purchase the product or service offered for sale.'

*Grgat* at ¶ 16, quoting *Richards v. Beechmont Volvo*, 127 Ohio App.3d 188, 190,

711 N.E.2d 1088, (1st Dist. 1998). Thus, "[a] matter that is merely incidental to the

choices a consumer must make when deciding to engage in the transaction is,

therefore, not 'deceptive' within the meaning of the [CSPA] * * *." *Davis v. Byers*

*Volvo*, 4th Dist. Pike No. 11CA817, 2012-Ohio-882, ¶ 29, quoting *Cranford v.*

*Joseph Airport Toyota, Inc.*, 2d Dist. Montgomery No. 15408, 1996 WL 282997,

*2 (May 17, 1996).

{¶41} "Although the CSPA uses the words 'unfair' and 'deceptive', 'a

consumer is not required to demonstrate that a supplier intended to be unfair or

deceptive.'" *Lump v. Best Door and Window, Inc.*, 3d Dist. Logan Nos. 8-01-09, 8-

01-10, 2002-Ohio-1389, 2002 WL 462863, *4 (Mar. 27, 2002), quoting *Frey v. Vin*

*Devers, Inc.*, 80 Ohio App.3d 1, 6, 608 N.E.2d 796, (1992).

'It is how the consumer views the act or statement which determines whether it is unfair or deceptive.' *Frey* * * * at 6 * * *. Consequently, '[i]f the supplier does or says something, regardless of intent, which has the likelihood of inducing in the mind of the consumer a belief

which is not in accord with the facts, the act or statement is deceptive.'
*Frey* * * * at 6 * * *. '[T]he basic test is one of fairness as the act
need not rise to the level of fraud, negligence or breach of contract.'
*Thompson v. Jim Dixon Lincoln Mercury, Inc*.[, 12th Dist. Butler No.
82-11-0109, 1983 WL 4353, *1] (April 27, 1983) * * *.

(Citations omitted.) *Lump* at *4. "Ohio courts have not interpreted the CSPA to be

a strict-liability statute and instead have considered 'reasonableness' when

determining whether conduct violates the CSPA." *Barlow v. Gap, Inc*., 8th Dist.

Cuyahoga No. 109101, 2020-Ohio-4382, ¶ 23.

**{¶42}** In turn, "R.C. 1345.03 defines unconscionable acts or practices in

connection with consumer transactions." *Snapp* at fn. 8. R.C. 1345.03 reads, in its

relevant part, as follows:

(A) No supplier shall commit an unconscionable act or practice in
connection with a consumer transaction. Such an unconscionable act
or practice by a supplier violates this section whether it occurs before,
during, or after the transaction.

(B) In determining whether an act or practice is unconscionable, the
following circumstances shall be taken into consideration:

(1) Whether the supplier has knowingly taken advantage of the
inability of the consumer reasonably to protect the consumer's
interests because of the consumer's physical or mental infirmities,
ignorance, illiteracy, or inability to understand the language of an
agreement;

(2) Whether the supplier knew at the time the consumer transaction
was entered into that the price was substantially in excess of the price
at which similar property or services were readily obtainable in
similar consumer transactions by like consumers;

-24-

(3) Whether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;

(4) Whether the supplier knew at the time the consumer transaction was entered into that there was no reasonable probability of payment of the obligation in full by the consumer;

(5) Whether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;

(6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment;

(7) Whether the supplier has, without justification, refused to make a refund in cash or by check for a returned item that was purchased with cash or by check, unless the supplier had conspicuously posted in the establishment at the time of the sale a sign stating the supplier's refund policy.

R.C. 1345.03(A-B). Thus, "'unfair or deceptive consumer sales practices' are those that mislead consumers about the nature of the product they are receiving, while 'unconscionable acts or practices' relate to a supplier manipulating a consumer's understanding of the nature of the transaction at issue." *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 24.

> While deceptive conduct may also be deemed to constitute an unconscionable act, the law is clear that to establish an unconscionable act or practice, the consumer must show a degree of knowledge sufficient to establish scienter.

*Frank v. WNB Group, LLC*, 2019-Ohio-1687, 135 N.E.3d 1142, ¶ 36 (1st Dist.).

*See Shank v. Charger, Inc.*, 186 Ohio App.3d 605, 2010-Ohio-1129, 929 N.E.2d

520, ¶ 46 (2d Dist.); *Campbell v. Wallace*, 7th Dist. Mahoning No. 19 MA 0133, 2020-Ohio-6819, ¶ 21; *Karst v. Goldberg*, 88 Ohio App.3d 413, 418, 623 N.E.2d 1348 (10th Dist. 1993). "'Knowledge' means actual awareness, but such actual awareness may be inferred where objective manifestations indicate that the individual acted with such awareness." *Bierlein v. Bernie's Motor Sales, Inc.*, 2d Dist. Montgomery No. 9590, 1986 WL 6757, *6 (June 12, 1986).

Legal Analysis

**{¶43}** The Becklers assert that the trial court erred in concluding that that they failed to demonstrate that RVW engaged in "deceptive, unfair, and/or unconscionable" acts that violated the CSPA. Appellants' Brief, 10. In their brief, they raise fourteen arguments to challenge the trial court's decision to grant summary judgment on their CSPA claims. After considering these fourteen challenges, we will address the Becklers' argument about whether damages for emotional distress are available for CSPA violations.

**{¶44}** First, the Becklers argue that the trial court erred in concluding that the model year of the recreational vehicle was not material to the transaction and that RVW never informed the Becklers that they were to receive a 2020 model. In this case, Durnell testified that the model year changes at a time chosen by the manufacturer. He explained as follows:

> with the years, it's not an exact science. We wish it were. If sales are
> really, really slow one year, with one factory went as early as February
> and switched the year, trying to get the jump on everybody else and

-26-

get everybody to order their stuff, and then everybody hurries up within a week and they change their year. So we've seen it as early as February, and then this year is the latest we've ever seen it. I don't think it switched until July. Normally it's somewhere March through June, usually it falls in April. But, again, it's so unscientific. It's at a whim. When the factory wants to change it, they change it. So it makes it difficult to know what it is going to be. So usually what we do is we ask and then the representative will tell us, you know * * * But we don't know until we see it and get the VIN number. And we don't get the VIN number until the unit. Maybe three days before we pick up the unit we will have a VIN number. Sometimes we don't get it until it actually arrives.

(Durnell Depo. 51-52). Lisa testified that she was aware of the difference between a model year date and a manufacture date. She also testified that she was aware that the manufacturer can change over the model year of the vehicles being produced as early as February. *Id*.

**{¶45}** In her deposition, Lisa also testified as to the reasons that they purchased the Wildwood FSX from RVW. She stated that they "had found a camper [they] * * * liked * * * in the Youngstown area * * *." (Lisa Depo. 10). She then contacted RVW, "saying we have this camper, you know, are you able to order it? What would the cost be?" *Id*. Her testimony also indicates that they ultimately went with RVW because of the price that was offered to them for the recreational vehicle. Thus, from Lisa's testimony, the Becklers appear to have been looking for a certain style of camper with a specific set of features at a competitive price.

**{¶46}** Lisa was also questioned about what substantive differences existed between a Wildwood FSX recreational vehicle that had a 2019 model year and a

Wildwood FSX recreational vehicle that had a 2020 model year. She stated: "There could be model upgrades, but I'm not aware of what all of the differences would have been." (Lisa Depo. 69). She further stated, "I don't know for sure. I just know usually when model years change things get better and improvements are made." *Id*. at 70. Thus, Lisa was unable to identify any substantive differences between the two model years. Rather, she testified that she simply assumed that there would have been upgrades. Further, when RVW discovered that the Becklers had received a 2019 model, Watt attempted to contact the Becklers with this information. Durnell then offered to replace the Becklers' 2019 model with a new 2020 model, but the Becklers refused this offer, opting to keep their 2019 model.

{¶47} After considering the evidence in the record, the trial court stated the following in its judgment entry:

> There is no evidence that in the record that Defendants ever expressly stated to Plaintiff verbally or in writing that they expected to receive a 2020 model RV. There is no evidence Defendant selected a specific model-year RV from Plaintiff's sales lot or show room floor.

(Doc. 169). The trial court later noted that,

> [i]n this case, there is no evidence Plaintiff advertised any RV to the Defendants. There is no evidence Defendants ever expressly conveyed an expectation to acquire a 2020 model RV. Rather, the record demonstrates Defendants expected to acquire an RV "like" the one they found in Youngstown. Defendants have not produced any evidence that the 2019 model RV was not like the one they found in Youngstown. Defendants have not produced any evidence that the 2019 model RV was any different from the 2020 model RV.

*Id.* Having conducted an independent review of the record on appeal, we cannot conclude that any of the trial court's aforementioned observations are not in accordance with the evidence in the record. Thus, there is no evidence that "the alleged deceptive practice * * * induce[d] the customer to enter into the transaction with the seller." *Rusk Industries v. Alexander*, 6th Dist. Lucas No. L-01-1328, 2002-Ohio-2171, ¶ 45.

{¶48} Further, beyond whether the model year was material to this transaction, we find additional guidance from the decision in *Crawmer v. National Trux-N-Parts*, 12th Dist. Preble No. CA93-09-016, 1994 WL 114321, *3 (Apr. 4, 1994). In *Crawmer*, the defendants placed an incorrect VIN on the title of a vehicle that was sold to the plaintiff. *Id.* The plaintiff then raised a CSPA claim over this issue. The Twelfth District noted that "[t]he basic test applied by Ohio courts when reviewing a claim under R.C. 1345.02 is whether or not the transaction was fair." *Id.* The Twelfth District then concluded that summary judgment was appropriate to the CSPA claim because the defendant, "[a]t the most, * * * made a mistake" and because "the record show[ed] * * * that [defendants-]appellees stood ready to remedy the situation." *Id.*

{¶49} In the case presently before this Court, Durnell acknowledged that the Becklers should have received a 2020 model but mistakenly received a 2019 model. RVW offered to remedy this issue by offering the Becklers a new 2020 model. However, the Becklers declined RVW's offer, opting instead to keep their 2019

model and accept a $2,000.00 payment from RVW. We follow the reasoning of *Crawmer* and conclude that summary judgment was appropriate to this CSPA claim because RVW, at most, "made a mistake" and "stood ready to remedy the situation." *Crawmer* at *3. Under the basic test of fairness applied to claims brought under R.C. 1345.02, the model-year discrepancy did not, in these circumstances, render this transaction deceptive or unfair. *Id*. Thus, the first argument is without merit.

{¶50} Second, the Becklers argue that the trial court erred by finding that RVW's "alteration of the purchase agreement" did not violate the CSPA. Appellants' Brief, 14. The basis of this allegation is a purchase agreement that was signed by Martin on May 16, 2019. This form contained a blank where the model year of the recreational vehicle was to be recorded. In this blank, the typed number "2020" is crossed out and is alongside the hand-written number "2019."

{¶51} However, in their text messages, Durnell confirmed that the Becklers had received a 2019 model rather than a 2020 model. He also admitted to Lisa that she should have received a 2020 and then offered a new 2020 model to the Becklers. This does not suggest that RVW was attempting to alter their agreement with the Becklers by making the identified notation. An RVW employee simply seems to have noted that the correct model year was "2019" rather than "2020." This brought the model year into accord with the VIN that was written on this form.

{¶52} We also note that RVW contacted the Becklers and informed them that their paperwork had to be "redone" because RVW could not obtain "a 2019 title

when [the] paperwork says 2020." (Doc. 136, Ex. 8). Further, pursuant to a subsequent agreement with RVW, the Becklers later decided to keep their 2019 model. In the face of these facts, the Becklers have not explained how this notation "induc[ed] * * * a belief which is not in accord with the facts * * *." *Frey*, *supra*, at 6. The Becklers also have not demonstrated how this act was unfair. *Walker, supra*, at ¶ 25. Thus, the second argument is without merit.

{¶53} Third, the Becklers argue that the trial court erred "in finding that predelivery concealment of damages does not constitute a CSPA violation." Appellants' Brief, 15. The Becklers point to the fact that a service manager at RVW, Candace Hackenberg ("Hackenberg"), testified that the records she reviewed before her deposition indicated that RVW had attempted to repair a scratch on the refrigerator before delivering the recreational vehicle to the Becklers. The record does not contain any indication that RVW was aware of any of the other issues that were later identified by the Becklers as needing repairs.

{¶54} The Becklers cite to *Borror v. MarineMax of Ohio, Inc.* to argue that CSPA violations can arise "even when a supplier discloses damages, but is inaccurate regarding the extent of the damage." Appellants' Brief, 15, citing *Borror*, 6th Dist. Ottawa No. OT-06-010, 2007-Ohio-562, ¶ 38-39. In *Borror*, defendants sold plaintiff a boat, disclosing only "that the vessel sustained only minor, nonstructural damage" in an accident. *Id.* at ¶ 3. The plaintiff testified that he was not told that the boat had hit a reef, had structural damage, "had been

-31-

grounded, the transmission replaced, propeller shafts repaired and stringer broken." *Id.* Thus, *Borror* addressed a situation in which a vessel had sustained major structural damage in an accident.

{¶55} By contrast, in the case presently before this Court, the record contains no indication that RVW concealed any damages to the Becklers' recreational vehicle, let alone major structural damages. The evidence in the record does not contain any indication that this issue with the refrigerator door affected the use or operation of the appliance in any way. Thus, the Becklers have identified what is apparently a minor, cosmetic issue with the refrigerator door. *See DeCola v. Pete Wing Contracting*, 11th Dist. Ashtabula No. 2009-A-0012, 2010-Ohio-2283, ¶ 25, 101. *Borror* is distinguishable because the Becklers have not produced any evidence that establishes that RVW concealed major structural issues with their recreational vehicle or that they relied upon any alleged representation regarding this issue.

{¶56} Further, once the Becklers identified the issue with the refrigerator door, RVW picked up the recreational vehicle from the Becklers and replaced this part. *See DeCola, supra*, at ¶ 85, 102 (considering a supplier's attempts to rectify defects in determining a CSPA violation had not been established). Since there is no dispute that the problem with the refrigerator door was resolved, the Becklers have not explained how this issue caused any damages in this case. *Davis v. Axelrod Chrysler Plymouth, Inc.*, 8th Dist. Cuyahoga No. 81765, 2003-Ohio-438, ¶ 23-24

(considering that the plaintiff did not demonstrate damages in deciding summary judgment was appropriate on a CSPA claim). The repair was conducted at no cost to the Becklers and after the summer camping season had concluded. With claims brought under R.C. 1345.02, we are to consider the reasonableness of the conduct and the fairness of the transaction. The Becklers have not produced any evidence establishing that the issue with the refrigerator door was an unfair or deceptive act or practice under the CSPA. Thus, the third argument is without merit.

{¶57} Fourth, the Becklers argue that the trial court erred by failing to conclude that RVW's concealment of the model year was "the cause" of their "undertakings" in modifying the features of their recreational vehicle and, therefore, "the but/for cause of the damages * * *." Appellants' Brief, 16. Thus, having failed to establish that the model year was material to their decision to purchase this recreational vehicle from RVW, the Becklers now assert that the model year was somehow material to—or "the cause" of—their subsequent decision to modify this recreational vehicle such that they could be considered to have "rel[ied] on the impression that that the model delivered" was a 2020 and to have incurred damages as a result. *Id.*

{¶58} As an initial matter, we note that the Becklers have not identified any evidence that would suggest that RVW concealed the model year of their recreational vehicle. Watt testified that, when he became aware of the issue with the model year, he attempted to contact the Becklers and give them this information.

-33-

Further, Durnell communicated with Lisa and contacted the manufacturer to confirm the model year of the recreational vehicle. He then sought to rectify the issue by offering the Becklers a new 2020 model.

**{¶59}** Further, the Becklers have not raised an argument or identified any evidence that would substantiate the assertion that the model year of the recreational vehicle was "the cause" of their decision to modify its features. Nonetheless, we will still consider their argument about damages. After discovering that the Becklers had received a 2019 model, RVW ultimately presented them with the following offer: (A) they could have $2,000.00 if they chose to keep the 2019 model or (B) they could have a new 2020 model if they chose to return the 2019 model.

**{¶60}** The Becklers assert that RVW's offer would not make them whole because, if they accepted the $2,000.00, they would not get a 2020 model, but if they accepted the new 2020 model, they would lose the value of the modifications that they made to the 2019 model. This purported dilemma is how the Becklers argue that the model year discrepancy is the "the but/for cause of the damages * * *." Appellants' Brief, 16. However, setting aside any legal implications of the Becklers ultimate decision to accept RVW's offer to resolve this issue, they still have not demonstrated that they were not made whole when they took the $2,000.00 from RVW and have not established that they incurred any damages in this case.

**{¶61}** As noted previously, the Becklers have not identified any substantive differences between a Wildwood FSX recreational vehicle with a 2019 model year

-34-

and a Wildwood FSX recreational vehicle with a 2020 model year. Thus, they have not established that, by retaining the 2019 model, they lost the benefit of any features that were present in a 2020 model and absent in a 2019 model. Further, by retaining their 2019 model, the Becklers did not lose the value of any of the modifications that they had made and received $2,000.00 from RVW when the price difference between a 2019 model and a 2020 model was only $1,500.00. Thus, the offer from RVW more than made the Becklers whole.

{¶62} Further, the record also indicates that the Becklers later traded in their Wildwood FSX recreational vehicle to Rhone's RV and received an allowance of $13,000.00 towards another recreational vehicle. After receiving the $2,000.00 to retain their 2019 model, the Becklers ultimately paid $9,898.00 to RVW for their recreational vehicle. Thus, they received more from Rhone's RV than they had originally paid to RVW for this unit. Thus, the Becklers have not established that they incurred any damages as alleged herein. Thus, the fourth argument is without merit.

{¶63} Fifth, the Becklers argue that the trial court erred in finding the issues alleged with the repair work on their recreational vehicle do not amount to CSPA violations. In particular, the Becklers assert that RVW indicated that the repairs to their recreational vehicle would take a few days to complete but instead took much longer. They also assert that the repair to the linoleum floor did not ultimately fix the issue. As to the first assertion, the Becklers have not identified any evidence

that establishes RVW ever indicated that the entire process of performing the requested repairs would be completed in a few days.

**{¶64}** Over the course of his text messages to Lisa, Durnell was very clear that the repairs would not take his staff much time to complete once RVW had received the required parts. Durnell indicated that he would "need it [the recreational vehicle] a few days" for his technicians to perform the work, but he repeatedly emphasized that RVW would need parts from the factory; that the length of time until all the repairs could be completed depended on the availability of these parts; and that RVW had been consistently experiencing delays in receiving these scarce parts from the factory. The work orders indicate that, once RVW received the necessary parts, the requested repairs took roughly two hours to perform.

**{¶65}** Further, just before RVW took the Becklers' recreational vehicle for repairs on October 14, 2021, the following exchange took place between Lisa and Durnell:

[Lisa:] We should have it back within a month right?

[Durnell:] I cant [sic] honestly say that. Parts are just crazy. I am sorry! I will do everything in my power to make it happen however.

(Doc. 136, Ex. 8). Thus, at the time that RVW took possession of the recreational vehicle, Lisa clearly did not anticipate the completion of the repairs after a few days. The record then indicates that the Becklers had the recreational vehicle back in their possession by November 22, 2021.

{¶66} The record does not contain any indication that RVW promised to have this entire process completed within a few days or any other stated timeframe. Further, courts have concluded that the failure to conduct repairs by a stated deadline or delays in completing such work do not alone constitute CSPA violations. *Keeton v. Hinkle*, 5th Dist. Morrow No. CA 871, 2000 WL 329809, *5 (Mar. 10, 2000); *DeCola, supra*, at ¶ 85 (holding the failure to complete a construction project "within the allotted time period" did not rise to a CSPA violation). Accordingly, the Becklers have not demonstrated that the length of times that these repairs took constituted unfair, deceptive, or unconscionable acts or practices under the CSPA.

{¶67} Turning to the quality of the repairs, the Becklers suggest that the requested repairs "were likely not completed as claimed" and that RVW merely concealed the damages. Appellants' Brief, 17. The Becklers cite *Gallagher v. WMK Inc*. to argue that such actions are a violation of the CSPA. *Gallagher*, 9th Dist. Summit No. 23564, 2007-Ohio-6615, ¶ 35-36. In *Gallagher*, the plaintiff alleged that, while the defendant had represented that it had replaced a pump on a wheelchair lift, no such replacement had occurred. *Id*.

{¶68} In the case presently before this court, the Becklers gave RVW a list of issues that needed to be addressed, including problems with the blinds, a scratch on the refrigerator door, and a slide that was tearing the linoleum floor. The record contains the warranty paperwork that was filed with Forest River to obtain the necessary parts and the work order that was filled out by the technicians at RVW.

Thus, the evidence in the record contains no indication that RVW falsely told the Becklers that new parts had been installed into the camper when, in fact, no such replacements were made or that RVW failed to perform any repair work while representing that repair work had been done.

{¶69} Further, when the recreational vehicle was returned to the Becklers, Lisa messaged Durnell on November 22, 2019, saying that the "Camper looks great." (Doc. 136, Ex. 8). The next message from Lisa to Durnell was sent on June 10, 2020. She stated the following: "So we used our camper for time [sic] you guys fixed it. The slide ripped the floor again." *Id.* In the course of the text messages, no other issues with any of the other repairs that were conducted are mentioned. In response to the reported issue, Durnell stated that RVW "fixed it. * * * With a slide out if you hit pothole, road debris, etc. and it is out of alignment. Many things can put it out of alignment. We tried your slide over 10 times to ensure it was good." (Doc. 136, Ex. 8). Lisa then insisted that the repair did not ultimately fix the issue.

{¶70} Unlike in *Gallagher*, the issue identified by the Becklers in this argument has to do whether the repair conducted by RVW was ultimately successful not whether a repair was ever attempted. "[N]ot every instance of substandard work is a violation of the [Consumer Sales Practices A]ct, if there is nothing deceptive or misleading about it * * *." *Paradise Homes, Inc. v. Limbacher*, 5th Dist. Tuscarawas No. 2004-AP-0037, 2005-Ohio-745, ¶ 35. *See also Yates v. Mason Master, Inc.*, 11th Dist. Lake No. 2002-L-001, 2002-Ohio-6697, ¶ 19. The Becklers

-38-

have not explained how RVW's alleged failure to ultimately fix the issue with the slide was more than substandard workmanship at worst and was instead an unfair, deceptive, or unconscionable act or practice under the CSPA. *DeCola, supra*, at ¶ 87 ("Quality of work, by itself, doesn't necessarily indicate a violation of the Consumer Sales Practice Act."). Thus, the fifth argument is without merit.

{¶71} Sixth, the Becklers argue that the trial court erred "in determining that plaintiff complied with its guarantee and did not try to evade its legal obligations." Appellants' Brief, 17. Specifically, the Becklers argue that RVW did not comply with the terms of their Buckeye Service Guarantee ("BSG"). The BSG reads as follows:

> The Ohio Buckeye Service Guarantee will provide a temporary replacement RV to any customer who is in need of a repair that if not completed will disrupt a planned camping trip. The definition of disrupt will be based on language in the extended warranty form.
>
> *Units in need of quick repairs not affecting the use of the unit will not qualify for a temporary replacement unit.* This Guarantee is subject to the terms and conditions contained in the extended warranty form.

(Emphasis added.) (Doc. 136, Ex. M-7). In her deposition, Hackenberg indicated that a customer receives what is offered under the BSG "[i]f they request it and if they qualify for it." (Hackenberg Depo. 36).

{¶72} However, the evidence in the record contains no indication that the Becklers ever requested the temporary use of a recreational vehicle under the BSG. Rather, the Becklers scheduled the repairs to be conducted at RVW after the summer

camping season had ended. Regardless of whether they qualified for the BSG, there is no indication in the record that the Becklers were in need of a temporary recreational vehicle to go on a planned camping trip; that the Becklers requested a temporary recreational vehicle from RVW for such a trip; or that RVW ever refused to loan a requested recreational vehicle to the Becklers.

**{¶73}** Hackenberg then explained that, to qualify for the BSG, the customer's "unit has to be inoperable." (Hackenberg Depo. 36). She said, "[f]or example, if your slide is stuck out and you can't drive it down the road, that would be inoperable. If you have a small tear on your floor in your linoleum, that wouldn't be inoperable." *Id.* The record does not contain any indication that the Becklers were unable to use their recreational vehicle to camp in this case. Thus, beyond the fact that the Becklers did not request a temporary recreational vehicle, the evidence in the record does not indicate that the Becklers qualified for one under the BSG.

**{¶74}** Further, the Becklers also argue that RVW was required to "pick up/drop off" their recreational vehicle for service repairs. However, in this case, Martin signed a Declaration of Warranty and Service Cooperation that stated, in the event that service repairs were necessary, they would "either agree to move the RV to a service location, or understand if a service call (trip charge) is applicable" that they would "be responsible for payment if not covered by the manufacturer or the extended warranty." (Doc. 136, Ex. 14).

**{¶75}** In the text messages exchanged between Lisa and Durnell, the BSG

was discussed as follows:

[Lisa:] We'd have to drop it off? Isn't there a buckeye guarantee (maybe another name)? I'd have to look back at my stuff but I remember it could be picked up.

[Durnell:] We have free delivery in Ohio when you buy. It doesn't cover back and forth for service. So yes, you would need to drop it off. Do you want to get it repaired now or wait till your trips are over?

[Lisa:] I'm looking back. Maybe it's just we get a replacement. We could drop it off get a replacement and camp that way and pick it up when it's done if it's just a few days.

(Doc. 136, Ex. 8). At this point, Lisa sent an online post from RVW that states,

"Need a repair, they come get your RV and give you a free RV to use. No one else

does that." (Doc. 136; Lisa Depo. 55-57). The exchange then continued as follows:

[Lisa:] You did say you would come get it.

* * *

[Durnell:] That is if your RV cannot be moved. But I will come and get it. Are we repairing now or waiting?

[Durnell:] I am happy to come and get it. Let me know if we are doing it now or waiting please.

[Lisa:] We can wait till fall so it's easier and you aren't as busy.

(Doc. 136, Ex. 8). This evidence indicates that RVW did not charge the Becklers

to pick up or drop off their recreational vehicle even though RVW did not believe

that the BSG required it to do so and even though Martin signed a document that

indicated these transportation costs were ultimately supposed to be his responsibility. Thus, the sixth argument is without merit.

**{¶76}** Seventh, the Becklers argue that the trial court disregarded the arbitration clause in the Disputes Addendum. Appellants' Brief, 18. "An arbitration clause in a contract is generally viewed as an expression that the parties agree to arbitrate disagreements within the scope of the arbitration clause * * *." *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 471, 1998-Ohio-294, 700 N.E.2d 859, 865 (1998). As with "any other contractual right, however, parties may waive the right to arbitrate." *Morris v. Morris*, 189 Ohio App.3d 608, 2010-Ohio-4750, 939 N.E.2d 928, ¶ 16 (10th Dist.).

> A party can waive his right to arbitrate under an arbitration clause by filing a complaint. * * * When a complaint is filed, the opposing party can save the right to arbitrate by seeking enforcement of the arbitration clause. * * * Enforcement of an arbitration clause is sought by filing a motion with the trial court to stay the proceedings pending arbitration.

(Citations omitted.) *Bowman v. Gordon*, 3d Dist. Van Wert No. 15-04-14, 2005-Ohio-1604, ¶ 6. "Failure to move for a stay, coupled with responsive pleadings, will constitute a defendant's waiver." *Belisle Construction Inc. v. Perry*, 3d Dist. Crawford No. 3-17-11, 2022-Ohio-239, ¶ 19, quoting *Mills v. Jaguar-Cleveland Motors, Inc.*, 69 Ohio App.2d 111, 113, 430 N.E.2d 965, 967 (8th Dist. 1980).

**{¶77}** In this case, RVW filed a complaint. The Becklers then filed an answer, counterclaims, and a third-party complaint. In its judgment entry, the trial

court noted that the Becklers did "not move[] the [trial c]ourt to stay this action and compel arbitration." (Doc. 169). Thus, regardless of whether the issues raised by the parties in this action fall within the scope of the arbitration clause in the Disputes Addendum, the actions of both parties waived any contractual right to arbitration that may have existed in this case. The Becklers have not demonstrated how the decisions of both parties to engage in conduct that waived any contractual right to arbitration constituted a deceptive, unfair, or unconscionable practice under the CSPA in this case. Thus, the seventh argument is without merit.

{¶78} Eighth, the Becklers argue that the trial court erred "in finding that the filing of baseless lawsuits" does not violate the CSPA. Appellants' Brief, 18. In its judgment entry, the trial court noted that the Becklers "have not addressed a Civ.R. 11" motion to contest the lawsuit they argued was frivolous. (Doc. 169).[3] "A frivolous claim is a claim that is not supported by facts in which the complainant has a good-faith belief, and which is not grounded in any legitimate theory of law or argument for future modification of the law." *Burrell v. Kassicieh*, 128 Ohio App.3d 226, 229, 128 N.E.2d 442, 445 (3d Dist. 1998), quoting *Jones v. Billingham*, 105 Ohio App.3d 8, 12, 663 N.E.2d 657, 659 (2d Dist. 1995). "[A] trial court's determination of whether a party has a good-faith argument under the law is a question of law * * *." *Burrell* at 229. While we make no determination as to the

---

[3] Similarly, the Becklers argued that RVW was engaging in abuse of process but did not file an abuse of process claim. However, the Becklers do not mention any abuse of process claim on appeal.

merits of the claims raised in RVW's complaint, the record and the complaint do not contain any indication that the claims raised by RVW are not, at the very least, colorable. The Becklers have not raised an argument that establishes that the claims in RVW's complaint are devoid of a legal or factual basis. Thus, the eighth argument is without merit.

{¶79} Ninth, the Becklers argue that RVW engaged in an unfair or deceptive act in violation of the CSPA when it promised them a free starter kit at closing but then had Martin sign a waiver of the promised starter kit on May 16, 2019. If purchased from RVW, a starter kit costs $229.00 and includes "what is necessary to camp immediately," including "your hoses, your wheel chalks, some sanitary pieces * * *." (Joshua Depo. 40). The Becklers argue that RVW engaged in an unfair or deceptive act by promising them a free starter kit to induce them into making a purchase at closing and then seeking a waiver of the promised starter kit.

{¶80} In this case, the purchase agreement contained a list of items included in the sale of the recreational vehicle at no cost. This list included the following: "Starter Kit per Josh Durnell: $0.00." (Doc. 136, Ex. M). Joshua Durnell ("Joshua"), a salesman employed at RVW, testified that the starter kit is "use[d] * * * as a closing tool" and affirmed that it is "an extra incentive for the consumer to move forward with the transaction[.]" (Joshua Depo. 40). Joshua also indicated that a starter kit was supposed to be included with the Becklers' recreational vehicle as reflected in the purchase agreement. *Id*. at 39. He then stated that, in this case,

the starter kit that was promised to the Becklers appears to have been "forgotten about." *Id.*

**{¶81}** However, the Becklers do not argue that the failure to provide a starter kit alone was a deceptive or unfair act or practice. Rather, to establish a CSPA violation, they turn to the waiver that was signed by Martin. RVW filed a copy of this waiver with its motion for partial summary judgment. This document reads, in its relevant part, as follows:

> I Martin Beckler understand by declining the below options and services offered by RV Wholesalers that I (the buyer) relieve RV Wholesalers of any financial responsibility or litigation due to damage that may occur as a result of not purchasing these options. Also by signing this agreement, I (the buyer) acknowledge that I have been given every opportunity by an RV Wholesalers representative to purchase and take advantage of these options.

(Doc. 136, Ex. 9). Beneath this paragraph is a list of ten items, including the starter kit. Beside each item, the customer is given the option to "accept" or "decline." On this waiver form, all ten items are marked as declined.

**{¶82}** Based on this document, the Becklers argue that RVW engaged in a deceptive or unfair practice by promising them a free starter kit to induce them into a purchase and then seeking a waiver of what had been promised. However, the testimony in the record and the wording of the waiver establishes that RVW did not engage in such a practice. During his deposition, Watt was asked about the starter kit on the waiver form in the following exchange:

[Attorney:] Turning back to Exhibit 1 [the Purchase Agreement] if you look in the itemization over here on the left hand side it says the starter kit per Josh Durnell is going to be included, correct, for no additional cost?

[Watt:] Correct.

[Attorney:] Do you know why then on Exhibit 9 [the Waiver Form] RVW had the Becklers decline the starter kit?

[Watt:] They were not purchasing it in closing so with that they've already gotten it so they didn't need a second one.

[Attorney:] Do you know for a fact that they received their starter kit?

[Watt:] I'm not sure.

(Watt Depo. 41-42). Thus, according to Watt's testimony, the Becklers were waiving the offer to *purchase* a starter kit at closing and were not waiving the provision of the previously promised starter kit.

{¶83} Similarly, Joshua's deposition testimony indicates that the Becklers should have received a starter kit at no cost but that this item was apparently "forgotten about" in the course of this transaction. (Joshua Depo. 40). This testimony indicates that the Becklers may not have received a starter kit because of an oversight on the part of RVW rather than because RVW had sought a waiver of the provision of the starter kit. Watt and Joshua's testimony is supported by the wording of the waiver. The document states that the signatory is acknowledging that RVW gave an opportunity to purchase a starter kit and is waiving the opportunity to "purchase" one. (Doc. 136, Ex. 9). Thus, the evidence in the record

suggests that the waiver addresses a different matter from the previously promised provision of a free starter kit.

**{¶84}** The Becklers have not identified any evidence that would suggest that RVW had Martin sign this waiver in an attempt to deceptively or unfairly circumvent its earlier promise to provide a free starter kit. In fact, the Becklers note, in their brief, that Watt and Joshua's testimony indicates that RVW was supposed to provide a starter kit "regardless of the 'Customer Waiver' form." Appellants' Brief, 18. Further, the evidence in the record indicates that any failure to provide the starter kit would have been an oversight that occurred because it was "forgotten about." (Joshua Depo. 39). The Becklers have not identified any evidence that would establish that this was anything other than an oversight.

**{¶85}** Given the undisputed facts mentioned herein, any alleged failure to provide a free starter kit does not, by itself, establish a violation of CSPA in this case.[4] Since the evidence in the record establishes that Martin was waiving the opportunity to purchase a starter kit and was not waiving the free provision of a starter kit, the Becklers have not established that RVW engaged in any allegedly deceptive act by having Martin sign a document for the purpose of getting him to waive the previously promised starter kit. Thus, the ninth argument is without merit.

---

[4] The failure to provide an item promised as part of a purchase agreement could arguably constitute a breach of contract. However, the record does not seem to contain a breach of contract claim raised by the Becklers over the alleged failure to provide a starter kit.

**{¶86}** Tenth, the Becklers argue that "Durnell's threats were unconscionable" and violated the CSPA. Appellants' Brief, 19. Prior to the filing of this action, Durnell and Lisa exchanged a number of text messages. In their motion to oppose partial summary judgment, the Becklers identified a number of the messages that were sent by Durnell, arguing that these messages contain threats that violate the CSPA. We have found but one case in which a plaintiff appears to have been awarded damages under the CSPA after having been threatened. In *Cook v. Newman Motor Sales*, the trial court awarded the plaintiff "$5,000 for anxiety resulting from * * * threats on [his] * * * life[.]" *Cook*, 6th Dist. Erie No. E-09-028, 2010-Ohio-2000, ¶ 7. The statements quoted in the Becklers' motion are of an entirely different nature from threats to a person's life.

**{¶87}** One of these identified messages came at the end of Lisa and Durnell's communications with each other. In this exchange, Lisa indicated that she was going to post negative reviews of RVW "on all the sales pages" to "make sure everyone * * * know[s] not do deal with you." (Doc. 138, Ex. 8). In response, Durnell indicated that he was going to take legal action against her, stating that if she "post[ed] one negative thing" RVW would "come after" her with its "full legal team." *Id*. In this and several subsequent statements, Durnell was no doubt communicating his willingness to bring a legal action against Lisa under Section Three of the Disputes Addendum if she posted any review that RVW perceived as being "libelous, false or misleading * * *." (Doc. 136, Ex. 22).

{¶88} This message came as the tone of the conversation between Lisa and Durnell was deteriorating and reaching its conclusion. By this point, both Lisa and Durnell had each stated that they were "done" with the other, indicating that they were not able to work through Lisa's complaints. (Doc. 136, Ex. 8). In response to the breakdown of their ability to work together productively, Durnell's statement indicated that he was going to resolve the dispute by availing himself of the legal process. In stark contrast to *Cook*, no threats were made that would convey a desire to resolve this dispute through unlawful force or violence. *Cook, supra*, at ¶ 7.

{¶89} Further, in the remaining statements identified by the Becklers, Durnell was responding to Lisa at the end of their conversation. By this point, Durnell and Lisa were exchanging expressions of mutual antagonism. They were also exchanging their perspectives of this situation with each of them providing a critical assessment of the other's behavior. However, none of the statements identified by the Becklers in their motion for summary judgment could arguably constitute a threat. *See* Black's Law Dictionary (11th Ed. 2019) (defining threat as "[a] communicated intent to inflict harm or loss on another * * *"). The Becklers have not identified a statement that constitutes an unconscionable threat that could be considered a CSPA violation. Thus, the tenth argument is without merit.

{¶90} Eleventh, the Becklers argue that the "plaintiff's litigation history demonstrates that it knowingly violated the CSPA." Appellants' Brief, 20. This argument relates to the following allegation in their motion opposing summary

judgment: "RVW and David Durnell have regularly filed baseless lawsuits and maliciously attacked consumers in public forums * * *." (Doc. 136). The Becklers point to one of RVW's admissions in which it acknowledges that it has not won a suit of this kind previously. However, regardless of whether RVW has previously won a case of this kind, we have already concluded that the suit presently before us has not been determined to be frivolous. Further, the Becklers have not demonstrated how the litigation history of RVW "induc[ed]" in their minds "a belief that was not in accord with the facts" or was unfair to them in any way that could constitute a violation of the CSPA. Thus, the eleventh argument is without merit.

{¶91} Twelfth, the Becklers argue that the trial court did not properly consider the following statements in paragraphs fifty-three and fifty-four of their motion to oppose partial summary judgment:

> 53. Through the course of the Becklers' dealing with RVW and David Durnell, RVW and David Durnell committed unfair, deceptive, and unconscionable acts and practices in violation of the Ohio Consumer Sales Practices Act and other state and federal laws, which conduct includes but is not limited to the following: representing that an RV has been supplied in accordance with a previous representation, if has not [sic]; representing that a consumer transaction involves or does not involve rights, remedies, or obligations if the representation is false; stalling and evading legal obligations; breaching a contract with a consumer, without any legal defense for not performing those obligations; filing a baseless lawsuit; violating the Becklers' constitutional rights, violating the Becklers' statutory rights, and other unfair and deceptive practices;
>
> 54. RVW and Durnells' actions have been declared to be unfair, deceptive or unconscionable acts and practices by rules adopted

pursuant to R.C. 1345.05(B)(2), and further have been determined by courts of this State to violate R.C. 1345.02 and/or R.C. 1345.03;

(Doc. 136). After considering the content of these paragraphs, the trial court concluded that "[t]hese allegations are pure, unsupported conclusory statements and legal conclusions." (Doc. 169).

{¶92} The Becklers' appellate arguments confirm this conclusion. The entirety of their supporting argument on appeal is as follows: "Paragraphs 53 and 54 are simply incorporations of the law into the various facts stated through the Amended Counterclaim and Memo. The allegations are supported by the evidence cited within the balance of the motion." Appellants' Brief, 20. "Unsupported, conclusory statements and legal conclusions do not provide sufficient evidence to overcome a motion for summary judgment." *Scott v. Marckel*, 3d Dist. Defiance No. 4-07-27, 2008-Ohio-2743, ¶ 30. "[R]esting on mere allegations against a motion for summary judgment * * * is insufficient." *King v. K.R. Wilson Co.*, 8 Ohio St.3d 9, 11, 455 N.E.2d 1282, 1283 (1983). Merging a collection of various legal conclusions with mere assertions contained in the pleadings is not sufficient to defeat summary judgment. Thus, the twelfth argument is without merit.

{¶93} Thirteenth, the Becklers argue that the trial court erred in concluding that a clause in the Disputes Addendum regarding the Consumer Review Fairness Act of 2016 ("CRFA") did not provide a basis for a CSPA violation. In their motion to oppose summary judgment, the Becklers asserted the following about this clause:

RVW and David Durnell committed to respecting the Becklers' rights under the Consumer Review Fairness Act of 2016 when, in fact, RVW and David Durnell had no intention of complying with the Act and have repeatedly violated the Act.

(Doc. 136). This assertion is based on the following clause in the Disputes Addendum: "This provision shall be interpreted so as to comply with all applicable federal and state laws, including without limitation, the 'Consumer Review Fairness Act of 2016.'" (Doc. 136, Ex. 22).

**{¶94}** To substantiate this claim, the Becklers argue that the RVW's litigation history indicates that it had no intention of complying with this provision. However, we have already concluded that the Becklers' arguments about RVW's litigation history and about the instant case being frivolous were without merit. The Becklers have not explained how RVW violated the CRFA by filing a suit under a provision that states it "shall be interpreted *so as to comply* with all federal and state laws, including * * * the 'Consumer Review Fairness Act of 2016.'" (Emphasis added.) (Doc. 136, Ex. 22). Beyond reasserting arguments that failed to establish that RVW was deceptive, unfair, or unconscionable within the meaning of the CSPA, the Becklers have identified no other facts, law, or arguments in support of their position. Thus, the thirteenth argument is without merit.

**{¶95}** Fourteenth, the Becklers argue that the trial court failed to consider a CSPA claim that alleged RVW engaged in a deceptive act by violating the deposit

rules in Ohio Administrative Code ("OAC") 109:4-3-07.[5] In their motion to oppose partial summary judgment, the Becklers listed fifty-six CSPA claims. The alleged violation of OAC 109:3-4-07 was the third alleged violation in this list. In its judgment entry, the trial court addressed these fifty-six alleged violations in thirteen groupings and listed which violations were being considered in each of these separate analyses. The trial court considered the third alleged violation under the first grouping alongside the other alleged violations that related to the model year of the Becklers' recreational vehicle.

**{¶96}** The alleged violation of OAC 109:4-3-07 appears to be the fact that the Becklers' receipt stated that a deposit was placed on Wildwood FSX with a model year of 2020 when a 2019 model was delivered. Thus, by addressing whether the significance of the model year to this transaction, the trial court directly addressed the root of this alleged CSPA claim even though it did not mention OAC 109:4-3-07 in its judgment entry. We have already concluded that the trial court was correct in its analysis of the issues surrounding the model year of the recreational vehicle in this case. On the basis of that prior analysis, we conclude that the Becklers have not demonstrated that the discrepancy between the model year listed on the deposit receipt and the model year on the vehicle that was

---

[5] This argument was raised under the first assignment of error but is considered here because it is directly affected by the disposition of the arguments herein.

delivered constitutes a deceptive or unfair act or practice under the CSPA. Thus, the fourteenth argument is without merit.

**{¶97}** Finally, the Becklers assert that the trial court erred in determining that they could not recover damages for emotional distress as the result of CSPA violations.[6] However, we have considered fourteen arguments against the trial court's decision to grant summary judgment on the Becklers' CSPA claims and found none of them to have merit. Since the Becklers have failed to establish that a genuine issue of material fact exists as to any of their CSPA claims, they cannot obtain any damages—emotional or otherwise—from any of these CSPA claims.

**{¶98}** Accordingly, the legal question as to whether emotional damages are generally available for CSPA violations is of no consequence to this appeal. For this reason, we need not and do not make a ruling on the legal issue raised in this argument. Rather, we simply conclude that, even if damages for emotional distress were available for CSPA violations, the Becklers cannot recover any such damages in this case because they have not properly established any CSPA violations. For these reasons, this final argument is without merit.

**{¶99}** In conclusion, having examined the evidence in a light most favorable to the nonmoving party, we determine that the Becklers failed to establish that a genuine issue of material fact exists for trial regarding their alleged CSPA claims.

---

[6] This argument was raised under their first assignment of error but is considered here because it is directly affected by the disposition of the other CSPA claims herein.

For this reason, we conclude that the trial court did not err in granting summary judgment as to these claims. Further, since summary judgment is appropriate to the Becklers' CSPA claims, we have declined to consider the legal question of whether damages for emotional distress are available for CSPA violations. Accordingly, the Becklers' second assignment of error is overruled.

*Third Assignment of Error*

**{¶100}** The Becklers argue that the trial court erred by granting summary judgment on their fraud claims.

Legal Standard

**{¶101}** The Supreme Court of Ohio has defined a fraud claim as including the following elements:

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Lucarell v. Nationwide Mutual Insurance Company*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458, ¶ 61, quoting *Gaines v. Preterm-Cleveland, Inc*., 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987).

Legal Analysis

**{¶102}** The Becklers acknowledge that the allegations that support the CSPA claims largely form the basis of their fraud claims. However, they raise five

-55-

arguments to challenge the trial court's disposition of their fraud claims. First, as in their second assignment of error, the Becklers assert that the trial court erred in concluding that the model year of the recreational vehicle was not material to this transaction. Under the second assignment of error, we determined that the model year was not material to this transaction. Relying on that prior analysis, we conclude herein that the Becklers have not produced evidence that could establish that any alleged representation from RVW as to the model year of the recreational vehicle was "material to the transaction at hand" or that the Becklers "relied on the representation" in purchasing this recreational vehicle. *Lucarell, supra,* at ¶ 61, quoting *Gaines, supra,* at ¶ 55. Thus, the first argument is without merit.

**{¶103}** Second, the Becklers also argue that the trial court erred in granting summary judgment on the grounds that there was no evidence in the record that RVW had actual knowledge of the model year number because RVW did not make this argument in its motion for partial summary judgment. In its judgment entry, the trial court noted that the Becklers

> have failed to produce any evidence that anyone with Plaintiff had actual knowledge that the RV was a 2019 model-year and not a 2020 model-year prior to Plaintiff delivering the RV on May 17, 2019. Without evidence of Plaintiff's actual knowledge of the model-year discrepancy, Defendants' fraud claim fails to the extent it is based on the model-year discrepancy.

(Doc. 169). On appeal, the Becklers have not identified any evidence in the record that would contradict this conclusion.

-56-

{¶104} However, we have already concluded that the Becklers failed to identify evidence that the model year was "material to the transaction at hand." *Lucarell, supra,* at ¶ 61, quoting *Gaines, supra,* at ¶ 55. "All of the[] elements must be present to find actionable fraud. * * * The absence of even one of these elements precludes recovery." (Citation omitted.) *Malek v. eResearch Technology, Inc.*, 2022-Ohio-3330, 199 N.E.3d 573, ¶ 24 (8th Dist.). Since the Becklers have not demonstrated that the model year was material to this transaction, their fraud claim fails regardless of whether the trial court should have concluded that the record did not contain any evidence that RVW knew that the Becklers were receiving a 2019 model year. Thus, the second argument is without merit.

{¶105} Third, the Becklers next argue that RVW engaged in deceptive and unfair practices by asking "them to waive items which they were previously promised." Appellants' Brief, 23. This argument refers to the document that Martin signed to waive the opportunity to purchase several items, including a starter kit. This was the subject of the Becklers' ninth argument under their second assignment of error. Based on the wording of the waiver and the testimony of two RVW employees, we concluded that Martin did not waive the provision of the previously promised starter kit but waived the opportunity to purchase a starter kit at closing. The evidence in the record does not contain any indication that the RVW promised a free starter kit to get the Becklers to enter a purchase agreement with the intention of later having Martin waive provision of this item at closing. Even assuming such

alleged actions could constitute fraud, the Becklers have not demonstrated that RVW, in fact, asked them to waive the items that had been previously promised. Thus, the Becklers have not demonstrated that RVW acted with the intent to mislead them as is required to establish a fraud claim. Thus, the third argument is without merit.

{¶106} Fourth, the Becklers assert that RVW failed to comply with the arbitration clause of the Disputes Addendum by filing this lawsuit and that this should be held to constitute fraud. However, in our analysis of the arguments raised under the second assignment of error, we have already concluded that both parties engaged in actions that waived any contractual right to arbitration that may have existed in this case. The Becklers have not raised an argument that could establish how a waiver from both parties of the contractual right to arbitration constituted fraud in this case. Thus, the fourth argument is without merit.

{¶107} Fifth, the Becklers also argue that the trial court failed to address whether RVW engaged in fraud by accepting a deposit from the Becklers to reserve a 2020 Wildwood FSX when RVW did not have such a vehicle in their possession and later delivered a 2019 model. In the fourteenth argument under the second assignment of error, we considered this challenge and determined that it was ultimately about the model year of the recreational vehicle. Any discrepancy in the paperwork regarding the model year was not material to this transaction. The

Becklers also have not identified any evidence that would suggest that RVW acted with the intent to mislead them in accepting a deposit and delivering a 2019 model.

{¶108} Further, in its brief, RVW states that "a 2019 model year was delivered rather than a 2020" and admits that this was a "mistake." Appellee's Brief, 23. When the mistake was discovered, RVW took steps to cure this issue, offering the Becklers a 2020 model. However, the Becklers refused this replacement recreational vehicle and instead opted to receive $2,000.00. Yet again, the Becklers have failed to demonstrate how the model-year discrepancy can serve as a basis for a fraud claim under the facts of this case. Thus, the fifth argument is without merit. Accordingly, the Becklers' third assignment of error is overruled.

*Fourth Assignment of Error*

{¶109} The Becklers argue that the trial court erred by granting summary judgment on their breach of contract claims against RVW.

Legal Standard

{¶110} Revised Code Chapter 1302 contains Ohio's codification of Article Two of the Uniform Commercial Code and "applies to transactions for the sale of goods * * *." *Action Group, Inc. v. NanoStatistics Corp.*, 10th Dist. Franklin No. 13AP-72, 2013 WL 6708395, ¶ 38. Under R.C. 1302.01(A)(8), "goods" are defined as including "all things * * * which are movable at the time of identification to the contract for sale * * *." Thus, "[r]ecreational vehicles * * * are clearly goods within the meaning of R.C. 1302.01(A)(8)." *Elderson v. Southwest Ford Sales Company*,

8th Dist. Cuyahoga No. 40981, 1980 WL 354796, *8 (Sept. 4, 1980). Where an "action is grounded upon what is in essence an alleged breach of a contract for the sale of a motor vehicle * * * resolution of this dispute must be guided by the provisions of R.C. Chapter 1302." *Hughes v. Al Green, Inc.*, 65 Ohio St.2d 110, 112, 418 N.E.2d 1355, 1356 (1981).

{¶111} In general, "if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may: (A) reject the whole; or (B) accept the whole; or (C) accept any commercial unit or units and reject the rest." R.C. 1302.60.

> Acceptance of goods occurs when the buyer:
>
> (1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or
>
> (2) fails to make an effective rejection as provided in * * * [R.C. 1302.61(A)], but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>
> (3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

R.C. 1302.64(A). In turn, R.C. 1302.61(A) states that a "[r]ejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."

> Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a non-conformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured * * *.

R.C. 1302.65(B). Aside from a rejection,

> The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it:
>
> (1) on the reasonable assumption that its non-conformity would be cured and it has not been seasonally cured; or
>
> (2) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

R.C. 1302.66(A). "A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them." R.C. 1302.66(C). But

> [r]evocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

R.C. 1302.66(B). "Where a tender has been accepted * * * the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy * * *." R.C. 1302.65(C). "The burden is on the buyer to establish any breach with respect to the goods accepted." R.C. 1302.65(D). Under R.C. 1302.88, the damages that are generally available for a breach with regard to accepted goods are as follows:

> (A) Where the buyer has accepted goods and given notification as provided in [R.C.] 1302.65 * * *, he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(B) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(C) In a proper case any incidental and consequential damages under [R.C.] 1302.89 * * * may also be recovered.

R.C. 1302.88. "It is axiomatic that a claimant seeking to recover for a breach of contract must show injuries as a result of the breach in order to recover damages from the breaching party." *Rasnick v Tubbs*, 126 Ohio App.3d 431, 435, 710 N.E.2d 750, 752 (3d Dist. 1998). "Damages are not awarded for a mere breach alone." *Id.*

Legal Analysis

{¶112} The Becklers raise three main arguments under this assignment of error. First, they assert that RVW did not mention the issue of damages in its motion for partial summary judgment and that, for this reason, the trial court erred by considering damages in disposing of their breach of contract claim. However, RVW began its motion for partial summary judgment by identifying records that indicated the Becklers traded in their recreational vehicle at Rhone's and received an allowance that was greater than what they had originally paid to RVW for this unit. Under the first assignment of error, the Becklers argued that the trial court erred in considering the issue of damages in its judgment entry. We found this argument to be without merit. Relying on this prior analysis, we again conclude that the

Becklers' arguments about the trial court's consideration of the issue of damages in granting summary judgment are without merit.

**{¶113}** Second, the Becklers argue that summary judgment was not appropriate to several allegations of breach of contract that were listed in Paragraph 117 of their complaint. In their brief, they identify the following allegations: (1) RVW "fil[ed] a lawsuit rather than seeking mediation or arbitration"; (2) RVW "fail[ed] to provide workmanlike repairs"; and (3) RVW "fail[ed] to provide timely warranty work." (Doc. 18). We will consider whether summary judgment is appropriate regarding these breach of contract allegations.

**{¶114}** As to the allegation regarding mediation and arbitration, the Becklers do not raise any new arguments in support of this allegation but simply reassert by incorporation the arguments that they raised on this same issue in their second and third assignments of error. We have already concluded that that these prior arguments were without merit because both parties undertook actions that waived any contractual right to arbitration that may have existed in this case. "As with any other contractual right, a party may waive the right to arbitrate." *Crosscut Capital, LLC v. DeWitt*, 2021-Ohio-1827, 173 N.E.3d 536, ¶ 12 (10th Dist.). Thus, the Becklers have failed to establish a breach of contract claim with this allegation.

**{¶115}** As to the allegation regarding workmanlike repairs, the record does not contain any evidence that the Becklers incurred any damages as the result of the alleged issues with the repairs conducted on their recreational vehicle. While RVW

has presented evidence that the Becklers received $3,102.00 more from Rhone's for their used recreational vehicle than they had paid to RVW for a new recreational vehicle, the Becklers have failed to respond with any evidence that they incurred any damages as the result of the allegedly faulty repair work that RVW conducted on their recreational vehicle.

{¶116} As to the allegation regarding timely warranty repairs, the Becklers have not demonstrated any damages were incurred as the result of the alleged delays in completing the work on their recreational vehicle. The record indicates RVW waited, at the election of the Becklers, to conduct the requested work on their recreational vehicle until the summer camping season had concluded so as not to interfere with their use of the recreational vehicle. The Becklers chose the date on which RVW was to pick up their recreational vehicle and did not use their recreational vehicle for over six months after it was returned.

{¶117} Further, the record does not contain any indication that the alleged failure to conduct timely repairs impaired the value of the recreational vehicle. Again, RVW has presented evidence that the Becklers traded in their recreational vehicle at Rhone's and received a trade in allowance that was greater than the amount they originally paid to RVW for the unit. In response, Becklers did not identify any evidence that could establish that a genuine issue of material fact exists for trial on the issue of damages. Thus, they have failed to establish a breach of contract claim with this allegation.

{¶118} Third, the Becklers argue that, even if they did accept the recreational vehicle, R.C. 1302.65(B) still allows them to pursue the remedies offered in R.C. 1302.01 to 1302.98. In its decision, the trial court found that the Becklers had accepted the 2019 model, stating the following:

> In this case, there is no genuine issue of fact that Defendants accepted the RV after discovering that it was a 2019 model unit and not a 2020 model unit. Defendants had reasonable time to inspect the RV after they discovered it was a 2019 model unit. Defendants did not make a seasonable rejection of the RV. Finally, Defendants took actions inconsistent with Plaintiff's ownership when they modified the RV as reflected in the deposition testimony of Defendant Lisa Beckler.

(Doc. 169). However, the facts of this case make clear that the Becklers obtained a remedy for the model year discrepancy before this litigation commenced.

{¶119} As we have noted previously, the record does not contain any evidence that establishes that substantive differences exist between a Wildwood FSX recreational vehicle with a 2020 model year and a Wildwood FSX recreational vehicle with a 2019 model year. However, Durnell indicated that the price of a 2020 model was $1,500.00 higher than the price of a 2019 model. For this reason, Durnell offered the Becklers the following options to resolve the model-year discrepancy: he would give them $1,500.00 if they kept the 2019 model or he would give them a new 2020 model if they returned the 2019 model.

{¶120} In response, Lisa negotiated, arguing that they had modified the features on their 2019 model and that they would lose these modifications if they accepted a new 2020 model. Durnell then gave the Becklers the following offer:

they could keep the 2019 model and receive $2,000.00 or they could return the 2019 model and receive a new 2020 model. Lisa responded, stating that they would accept the $2,000.00 from RVW. The record indicates that Lisa then accepted a $2,000.00 payment from RVW.

{¶121} The Becklers have not explained how they were not made whole by their decision to accept RVW's offer of $2,000.00 to address the model-year discrepancy. The record establishes that the Becklers were able to keep the modifications that they had made to their 2019 model. They also received $500.00 more than the $1,500.00 price difference between a 2019 model and a 2020 model. Thus, the evidence in the record indicates that the issue regarding the model-year discrepancy was remedied before this litigation was ever commenced.

{¶122} In response to the evidence produced by RVW, the Becklers have not produced any evidence or identified any materials in the record that would suggest that they incurred any damages as the result of the model-year discrepancy that were not addressed by the $2,000.00 payment they received from RVW. Thus, the Becklers have not demonstrated damages on this issue. Rather, the evidence in the record indicates that they were made whole long before the trial court granted summary judgment on this claim. Thus, the third argument is without merit. Accordingly, the Becklers' fourth assignment of error is overruled.

*Conclusion*

{**¶123**} Having found no error prejudicial to the appellants in the particulars assigned and argued, the judgment of the Logan County Court of Common Pleas is affirmed as to the matters raised therein.

***Judgment Affirmed***

**MILLER, P.J. and WALDICK, J., concur.**

**/hls**